**Affirmed and Opinion filed June 26, 2018.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-17-00279-CV

---

### RENEE RICE, D.O. AND NSR PHYSICIANS, P.A., Appellant

### V.

### PATRICIA A. MCLAREN, Appellee

---

**On Appeal from the 334th District Court
Harris County, Texas
Trial Court Cause No. 2016-34771**

---

## O P I N I O N

In this interlocutory appeal, we address the sufficiency of an expert report under section 74.351 of the Texas Civil Practice and Remedies Code. Appellants Dr. Renee Rice, D.O. and NSR Physicians, P.A. (collectively referred to as Dr. Rice) contend the trial court erred in denying their motion to dismiss the medical negligence claims of appellee Patricia A. McLaren for her failure to serve a report complying with the Act.

McLaren alleges in her suit that Dr. Rice's negligence, along with that of several other physicians, caused the portal vein thrombosis with bowel ischemia that she developed after undergoing elective bariatric surgery. Dr. Rice argues that McLaren's expert reports fail to state facts supporting a causal connection between Dr. Rice's acts or omissions and the claimed injury. We conclude that the expert report sufficiently links Dr. Rice's failure to appreciate the need for keeping McLaren on anticoagulants and to consult a hematologist to the continued clotting problems and ultimate portal vein thrombosis with bowel ischemia she suffered. We therefore affirm the trial court's order denying Dr. Rice's motion to dismiss.

## BACKGROUND[1]

On March 20, 2014, McLaren underwent elective bariatric surgery, including a laparoscopic vertical sleeve gastrectomy and a laparoscopic repair of diaphragmatic hernia. Dr. Matthew St. Laurent performed the surgery at the North Cypress Medical Center. In addition to other medical conditions, McLaren had a lengthy history of blood clotting issues, including deep vein thrombosis (DVT), that she treated with long-term use of anticoagulant medication. In preparation for the surgery, McLaren went off her regular anticoagulant, Coumadin, and began temporary use of Lovenox. Dr. St. Laurent decided that McLaren should stop her Coumadin during this timeframe. Dr. Ronjay Rakkhit, a hematologist who had managed McLaren's blood clotting issues for several years prior to her surgery, was not consulted.

Hospital records indicate that McLaren tolerated the procedure well, and she was discharged from the hospital the next day. The discharge summary and patient

---

[1] Given the preliminary stage of the proceeding, we draw the background facts from the allegations in McLaren's live pleading and the two reports of her expert. Both parties likewise rely on these facts.

instructions from her surgery state that McLaren should restart her Coumadin upon her return home. Though Coumadin is known to take time to rise to a therapeutic level in the bloodstream, McLaren was not prescribed any "bridging therapy," such as the continuation of Lovenox, to guard against blood clotting issues until the Coumadin returned to a therapeutic level.

On March 24, three days after her discharge, McLaren went to the emergency room at North Cypress Medical Center complaining of shortness of breath. A CT of her abdomen revealed an intra-abdominal hemorrhage, and she was diagnosed as suffering from hypovolemic shock, anemia due to blood loss, respiratory failure, acute venous embolism, and DVT in her distal lower extremity. McLaren was started on Lovenox and admitted to intensive care. A pulmonologist, Dr. Puppala, was asked to consult; he initially believed that McLaren had suffered a "massive pulmonary embolism."[2] Dr. Puppala recommended discontinuing the Lovenox, starting a Heparin protocol (without the initial bolus), and placing an inferior vena cava (IVC) filter to catch any clots. The IVC filter was placed later that same day.

Dr. Rice first saw McLaren the next day and served as the primary hospitalist for McLaren during this hospital stay. Neither Dr. Rice nor any of the physicians treating McLaren consulted a hematologist regarding McLaren's treatment.

McLaren remained in the hospital for about a week and was discharged on March 31. In the discharge summary, Dr. Rice noted that all anticoagulant medication had been stopped during the hospital stay and that upon going home, McLaren was not to take her Coumadin. This notation was based on Dr. Puppala's decision to restart McLaren's anticoagulation medication in two to three weeks. Thus, McLaren was discharged from the hospital while off Coumadin and with the

---

[2] Tests subsequently showed that McLaren did not have a massive pulmonary embolism.

3

IVC filter in place.

On April 9, nine days after her discharge, McLaren returned to the emergency room at North Cypress Medical Center, again complaining of difficulty breathing. A CT scan revealed that McLaren suffered from extensive portal vein thrombosis with bowel ischemia. She was septic and given a "poor overall prognosis." Further testing revealed fluid-filled small bowel loops in her abdomen, consistent with an obstructive process. McLaren remained in the hospital until April 25, but was discharged "still suffering from portal vein thrombosis, superior mesenteric vein thrombosis, anemia, and a hypercoagulability state." The discharge summary incorrectly stated that the bowel ischemia had resolved. McLaren was advised to re-start her Coumadin upon discharge, and this time was also prescribed Lovenox to take until the Coumadin reached a therapeutic level.

Less than a week after her discharge, on May 1, McLaren was taken to Memorial Hermann/Memorial City Hospital. She was near death, and tests showed she likely had a perforated bowel and possible bowel ischemia. A physician at Memorial Herman, Dr. Thakrar, noted that "[g]iven history of thrombosis as well as hypercoagulable state, we will still elect to anticoagulate the patient. Given the complexity and history of this patient's hypercoagulable state, we will consult the patient's hematologist, Dr. Ronjay Rakkhit." McLaren underwent emergency surgery, where the surgeon noted extensive fluid in her abdomen, significant small intestine damage, and numerous clots within her pelvis. Surgeons removed a 60-centimeter portion of her small intestine. McLaren remained hospitalized for three weeks and was then transferred to a long-term acute care facility. According to McLaren's live pleading, her total medical bills exceed $1.3 million.

McLaren sued Dr. Rice[3] and several other treating physicians for the care she received prior to her May 1, 2014 admission to Memorial Hermann. McLaren served an expert report authored by Dr. Charles J. Grodzin, a specialist in pulmonary diseases and intensive care medicine. In his original report, Dr. Grodzin criticized, among other things, the failure to continue sufficient anticoagulation therapy during McLaren's first two hospitalizations, and the failure to consult a hematologist with regard to her pre-, peri-, and post-operative care. Dr. Rice objected to the report on grounds that it failed to identify the specific conduct by her that breached the standard of care and failed to state sufficient facts supporting causation. The causation challenge targeted Dr. Grodzin's reliance on his understanding that Dr. Rakkhit (the hematologist) would have recommended that McLaren remain on anticoagulant medication after her initial surgery had he been consulted. The trial court sustained Dr. Rice's objections to the expert report but gave McLaren a thirty-day extension to file a report complying with section 74.351.

McLaren filed a supplemental expert report by Dr. Grodzin, and Dr. Rice again objected to the report. Dr. Rice maintained that the supplemental report remained insufficient because, as in the original report, Dr. Grodzin was speculating as to what a hematologist might have done if consulted. The trial court denied Dr. Rice's motion to dismiss without stating its reasons for doing so, and this appeal followed. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(9) (West Supp. 2017).

**ANALYSIS**

---

[3] Dr. Rice worked for NSR Physicians, PA at the time of the events alleged in this action. McLaren pleaded only vicarious liability as to NSR Physicians, PA for the actions of Dr. Rice. "When a party's alleged health care liability is purely vicarious, a report that adequately implicates the actions of that party's agents or employees is sufficient." *Gardner v. U.S. Imaging, Inc.*, 274 S.W.3d 669, 671-72 (Tex. 2008) (per curiam). We thus refer to Dr. Rice and NSR Physicians, PA collectively throughout this opinion.

5

Dr. Rice brings three issues challenging the denial of her motion to dismiss McLaren's suit for failure to serve a sufficient expert report. In her first issue, Dr. Rice contends the trial court abused its discretion because the court's order does not refer to any guiding rules or principles. In her second issue, Dr. Rice argues generally that the trial court abused its discretion because Dr. Grodzin's reports fail to inform her of the specific conduct called into question or provide a basis for the trial court to conclude the claims have merit. In her third issue, Dr. Rice contends that Dr. Grodzin's reports fail to establish causation by linking his conclusions to the facts as they apply to Dr. Rice.

Dr. Rice briefs her second and third issues together, basing both on her contention that the reports fail to establish the requisite causal link between her actions and the injury or damages claimed. We will likewise address her second and third issues together and then turn to her first issue.

## I.     Standards of review and applicable law

We review for abuse of discretion a trial court's ruling on a motion to dismiss for failure to comply with section 74.351. *Am. Transitional Care Cntrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001); *Univ. of Tex. Med. Branch at Galveston v. Callas*, 497 S.W.3d 58, 62 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). A trial court abuses its discretion if it acts arbitrarily or unreasonably or without reference to guiding rules or principles. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam).

A party asserting a healthcare liability claim must file an expert report and serve it on each party not later than the 120th day after the petition is filed. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a) (West 2017). The report must provide "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician . . . failed

to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6). If a plaintiff does not timely serve an expert report meeting the required elements, the trial court must dismiss the healthcare claim on motion of the affected healthcare provider. *See id.* §§ 74.351(b), (*l*); *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 513 (Tex. 2017) (per curiam); *Gannon v. Wyche*, 321 S.W.3d 881, 885 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). If elements of the report are found deficient, as opposed to absent, the court may (as it did here) grant a thirty-day extension to cure the deficiency. Tex. Civ. Prac. & Rem. Code § 74.351(c); *Gannon*, 321 S.W.3d at 885.

Although the expert report need not marshal all of the plaintiff's proof, it must include the expert's opinions on the three statutory elements of standard of care, breach, and causation. *Palacios*, 46 S.W.3d at 878; *Kelly v. Rendon*, 255 S.W.3d 665, 672 (Tex. App.—Houston [14th Dist.] 2008, no pet.). The report need not use "magic words" or meet the same standards as evidence offered on summary judgment or at trial. *See Kelly,* 255 S.W.3d at 672 ("The expert report is not required to prove the defendant's liability."); *see also Jelinek v. Casas*, 328 S.W.3d 526, 540 (Tex. 2010) (stating no magic words are required). Bare conclusions or speculation, however, will not suffice. *See Wright*, 79 S.W.3d at 52, 53.

To constitute a good-faith effort to comply with these requirements, the expert report must provide enough information to fulfill two purposes of the statute: (1) inform the defendant of the specific conduct the plaintiff has called into question, and (2) provide a basis for the trial court to conclude that the claims have merit. *Palacios*, 46 S.W.3d at 879; *see also Miller*, 536 S.W.3d at 513.

## II.     The expert reports satisfy the causation requirement.

Dr. Grodzin's original and supplemental reports describe two breaches of the standard of care by Dr. Rice: (1) the failure to provide or ensure adequate

anticoagulation therapy for McLaren during her second hospitalization; and (2) the failure to consult with McLaren's hematologist Dr. Rakkhit or a staff hematologist. Dr. Rice argues on appeal that Dr. Grodzin fails to link these alleged breaches to the facts of the case and does not state how and why Dr. Rice's failures were a substantial factor in bringing about the harm McLaren sustained.

## A.    Applicable law regarding causation

Although the plaintiff in a medical negligence case is not required to prove proximate cause with her expert report, the report must show that the expert is of the opinion she can do so regarding both foreseeability and cause-in-fact. *See Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017). An expert's mere ipse dixit will not suffice; the expert must explain the basis of his or her conclusions, showing how and why a breach of the standard of care caused the injury. *See id.* ("the expert report must make a good-faith effort to explain, factually, how proximate cause is going to be proven"); *Jelinek*, 328 S.W.3d at 539. The conclusion must be linked to the facts of the case and cannot contain gaps in the chain of causation. *See Wright,* 79 S.W.3d at 52; *Humble Surgical Hosp., LLC v. Davis*, 542 S.W.3d 12, 23 (Tex. App.—Houston [14th Dist.] 2017, pet. filed).

We determine whether an expert report is sufficient under section 74.351 by considering the opinions in the context of the entire report, rather than taking statements in isolation. *See Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 144 (Tex. 2015) (per curiam) (trial court should review all of expert's opinions rather than considering statements in isolation); *see also Baty v. Futrell*, 543 S.W.3d 689, 694 (Tex. 2018). Multiple reports may be read in concert to determine whether the plaintiff has made a good-faith effort to comply with the statute's requirements. *Miller*, 536 S.W.3d at 513. Our review is limited to the four corners of the report, and we cannot make inferences to establish the causal connection. *See Austin Heart,*

8

*P.A. v. Webb*, 228 S.W.3d 276, 281 (Tex. App.—Austin 2007, no pet.) (expert report that required reader to infer or make educated guess as to which of two doctors breached standard of care and caused injury was not adequate).

## B.    Dr. Grodzin's reports

Dr. Grodzin's opinions appear in his original and supplemental reports, which together total 19 single-spaced pages.  In his original report, Dr. Grodzin stated in pertinent part:

> On 3/24/2014, Mrs. McLaren presented to the North Cypress Medical Center ER by ambulance complaining of shortness of breath. . . . Lower extremity venous Doppler ultrasound revealed the presence of bilateral lower extremity deep venous thrombosis.  Dr. Puppala's initial impression was "a massive pulmonary embolism."  Dr. Puppala also indicates in his Consultation Note that he had discussed with the patient and her family and [sic] interventional radiology placement of an IVC filter.

> * * *

> At 1721 on March 24, Mrs. McLaren was taken from ICU to a procedure room where an IVC filter was placed.

> * * *

> On March 25, Mrs. McLaren was also seen by Dr. Renee Rice.  Dr. Rice also diagnosed anemia due to blood loss.  In his progress note of March 25, Dr. St. Laurent noted: "Found to have a mild to moderate intra-abdominal bleed that was perisplenic.  Most likely this is what was responsible for her drop in Hgb, hypotension and abdominal pain. . . . Dr. St. Laurent also indicates that an IVC filter had been placed yesterday (March 24), so that "we could stop her Blood thinners and stop the intra-abdominal bleed."

> * * *

> Mrs. McLaren was discharged from the hospital on 3/31/2014.  In her Discharge Summary, Dr. Renee Rice notes that all anticoagulant

medications had been stopped during Mrs. McLaren's hospitalization and that upon discharge and going home, Mrs. McLaren was not to continue taking her Coumadin.

\* \* \*

**Breaches of the Standard of Care**

\* \* \*

**Failure to Involve a Hematologist/Oncologist in the Care of Mrs. Patricia McLaren and Failure to Continue Systemic Anticoagulation**

Later in Mrs. McLaren[']s hospitalization at Memorial Hermann Hospital she fell under the care of Dr. Thakrar. Dr. Thakrar recognized the importance of continuing anticoagulant medication therapy, given Mrs. McLaren's history of thrombosis related to her hypercoagulable state. This is further evidence of the standard of care that should have been followed by Dr. St. Laurent, Dr. Rice and Dr. Puppala . . . during her next hospital admission at North Cypress Medical Center on 3/24/2014 when he breached the standard of care in failing to consult with Dr. Ronjay Rakkhit, or other hematologist, and in discontinuing her anticoagulant medication therapy.

I understand that Dr. Rakkhit will also indicate that if he had been consulted upon Mrs. McLaren's admission to the hospital on March 24, he would not have discontinued the anticoagulant medication therapy, and that Mrs. McLaren's hypercoagulopathy could be managed with medications during that hospitalization, notwithstanding the internal bleed that was shown on the abdominal imaging.

Therefore, it was a breach of the standard of care by Dr. St. Laurent, Dr. Rice and Dr. Puppala not to appreciate Mrs. McLaren's need for systemic anticoagulation and hematological consultation.

\* \* \*

. . . At the time of discharge on March 31, 2014, Dr. Rice noted in her discharge summary that Mrs. McLaren was discharged while off Coumadin. Clearly, for [sic] patient with a clotting disorder and a foreign body in the inferior vena cava, this combination of events

10

placed Mrs. McLaren at increasing risk for further devastating thrombotic events such as those that ultimately occurred.

\* \* \*

As a matter of substantiation, I have pointed out that Dr. St. Laurent, Dr. Puppala, and Dr. Rice failed to consult Dr. Ronjay Rakkhit in the preoperative, perioperative, and postoperative period as well as at the readmissions for Mrs. McLaren at North Cypress Medical Center. This point is further validated in . . . the "game plan" instituted by Dr. Thakrar. Dr. Thakrar recognized the importance of immediately obtaining a consultation with the physician most familiar with Mrs. McLaren's hypercoagulable state, Dr. Rakkhit. Dr. Rakkhit was never consulted, never called, and never asked to assist in Mrs. McLaren's care . . . from the time of Dr. St. Laurent's surgery through the date of her discharge from North Cypress Medical Center on 4/25/2014.

\* \* \*

At any point, Dr. Rice, Dr. Puppala or Dr. St. Laurent could have consulted Dr. Rakkhit or any other hematologist for consultation in the management of bridging anticoagulation, Coumadin prescription or the indications for continuing systematic anticoagulation even if the face of intra-abdominal bleeding with a more expert approach weighing the risks and benefits of anticoagulation therapy. Because this wasn't done, Mrs. McLaren was left off anticoagulation in an all-or-none fashion which doomed her to inevitable clotting complications such as those from which she suffered.

In his supplemental report, Dr. Grodzin stated:

Dr. St. Laurent's and Dr. Puppala's decision to discontinue anticoagulant therapy during [the March 24, 2014] hospitalization and to inappropriately place an IVC filter, without first seeking the assistance of Dr. Rakkhit or another staff hematologist, directly caused the massive portal vein thrombosis for which she was again hospitalized on 3/31/2014.[4]   I described this medical causation in

---

[4] We presume Dr. Grodzin meant to state this date as April 9, 2014. Elsewhere in his report, Dr. Grodzin states McLaren was discharged on March 31, 2014, and then re-hospitalized on April 9, 2014.

detail in my original report, but I mention it again as an example of my knowledge of the standard of care that should have been followed by Dr. St. Laurent, and the consequences that can occur when one fails to follow that standard of care in failing to seek the assistance of a hematologist in circumstances such as these. That is why the standard of care required Dr. St. Laurent to call in Dr. Rakkhit, or another staff hematologist, who could have assisted in Mrs. McLaren's care by pointing out that the bleeding could be addressed without discontinuing the anticoagulant medication therapy or placing an IVC filter.

* * *

The sentence in my original report of "I understand that Dr. Rakkhit will also indicate that if he had been consulted . . . he would not have discontinued the anticoagulation therapy. . ." comes from a discussion that Mrs. McLaren had with Dr. Rakkhit. However, assuming that Dr. Rakkhit did make that comment to Mrs. McLaren (and I agree with his comment) my review of this case, my opinions, and the breaches of the standard of care that I have set forth in my original report and in this supplemental report, are in no way dependent on what Dr. Rakkhit may have correctly assessed.

* * *

Likewise, if Dr. Rakkhit or another staff hematologist had been called in during the March 24, 2014 admission, as would be required to fulfill the standard of care, Mrs. McLaren would have received appropriate anticoagulation therapy and would not have had placement of an IVC filter. As I describe in detail in my original report, the failure to give Mrs. McLaren appropriate anticoagulation therapy during this hospitalization, coupled with the improper IVC filter, medically caused the massive portal vein thrombosis which necessitated her hospitalization again on March 31, 2014,[5] and the further medical complications for which she was treated later during her hospitalization at Memorial Hermann Hospital-Memorial City – all of which I have described in detail in my original report.

* * *

---

[5] See footnote 4.

12

. . . Dr. Rice is a hospitalist, and I am familiar with the standard of care of a hospitalist in taking care of a patient with Mrs. McLaren's bleeding and blood clotting problems detailed in the chart for Mrs. McLaren's March 24, 2014 admission. . . . She was initially started on Lovenox. However Lovenox was discontinued after Dr. Rice became Mrs. McLaren's hospitalist. Dr. Rice did not appreciate the need for systematic anticoagulation and allowed Mrs. McLaren's anticoagulation therapy to be discontinued. No anticoagulation medication was given throughout the remainder of this hospital admission, and when Mrs. McLaren was discharged, she was instructed not to resume her Coumadin for two to three weeks. As a hospitalist, Dr. Rice had treatment responsibilities with respect to Mrs. McLaren's care separate and apart of the care and treatment [of] Dr. St. Laurent and Dr. Puppala. For instance, it was Dr. Rice who ordered a repeat CT scan of the abdomen on March 27 as she continued to monitor Mrs. McLaren's condition including her continual drop of her hemoglobin and hematocrit. The standard of care required Dr. Rice to also have either Dr. Rakkhit or a staff hematologist see Mrs. McLaren and provide assistance in managing both the internal bleeding that the CAT scans showed as well as the DVT and clotting disorder from which Mrs. McLaren was still suffering.

In failing to call in Dr. Rakkhit or have a staff hematologist assist in the managing [of] Mrs. McLaren's bleeding and clotting problems, Dr. Rice breached the standard of care. Had Dr. Rice consulted Dr. Rakkhit or a staff hematologist, she would have been advised regarding how to manage Mrs. McLaren's thrombophilic state and to continue her anticoagulant medication therapy notwithstanding the intra-abdominal bleeding. Her breach of the standard of care was medically causative of Mrs. McLaren's continued bleeding, continued clotting problems, and the extensive portal vein thrombosis and the other serious medical problems, including superior mesenteric vein thrombosis and bowel ischemia, problems for which she was [later] hospitalized . . . .

## C. The reports represent a good-faith effort and are adequate.

In Dr. Grodzin's opinion, the standard of care required Dr. Rice, who had treatment responsibilities separate from Dr. St. Laurent and Dr. Puppala, to appreciate the need for McLaren to remain on anticoagulant medication therapy and

13

to consult a hematologist regarding her care.[6] Dr. Rice's alleged failure to meet that standard of care, in Dr. Grodzin's opinion, caused the injury and damages claimed by McLaren because McLaren, who had a history of blood clotting issues, was left off anticoagulant therapy. Dr. Grodzin stated that had Dr. Rice consulted McLaren's hematologist Dr. Rakkhit or a staff hematologist, she would have been advised to keep McLaren on anticoagulant therapy, and her failure to consult was medically causative of McLaren's "continued bleeding, continued clotting problems, and the extensive portal vein thrombosis and the other serious medical problems, including superior mesenteric vein thrombosis and bowel ischemia."

A causal relationship is established when the expert explains how the negligent act or omission was a substantial factor in bringing about the harm and that, absent that act or omission, the harm would not have occurred. *See Zamarippa*, 526 S.W.3d at 460; *Tenet Hosps., Ltd. v. Garcia*, 462 S.W.3d 299, 310 (Tex. App.— El Paso 2015, no pet.). Here, Dr. Grodzin stated what should have been done— appreciate the need for keeping McLaren on anticoagulants and consult a hematologist—and how the failure to do so was linked to the continued clotting problems and ultimate portal vein thrombosis with bowel ischemia suffered by McLaren. *See Garcia*, 462 S.W.3d at 312; *see also Sanjar v. Turner*, 252 S.W.3d 460, 468 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (expert report adequate on causation where report stated the causal link between failure to adequately monitor condition and death from excessive medication).

### 1. Facts underlying the causation opinion

Dr. Rice argues that the opinion is not grounded in established facts because Dr. Grodzin does not explain how he "has any idea" what advice Dr. Rakkhit, or

---

[6] Dr. Rice does not challenge Dr. Grodzin's statement of the standard of care that applied to her.

another hematologist, would have given had Dr. Rice consulted them, and Dr. Grodzin's statement of his understanding as to what Dr. Rakkhit would have advised is based on hearsay. We disagree.

Dr. Grodzin stated in his supplemental report that he has experience caring for patients with McLaren's condition post-surgery:

> I have personally been involved in working with bariatric surgeons and hospitalists, both preoperatively and postoperatively, in cases like Mrs. McLaren's, where the bariatric surgeon and the hospitalist are seeking medical assistance in dealing with a patient's bleeding and clotting disorders. . . . [T]hese are not "all surgical decisions." These are decisions that involve the patient's health and decisions that are arrived at by discussions between surgeons like Dr. St. Laurent and hematologists like Dr. Ronjay Rakkhit who has the most knowledge about Mrs. McLaren's bleeding and clotting disorder. . . . When we work as a team in treating patient's bleeding and clotting disorders, we talk, we consult with each other, we share medical information, and we discuss what each of us should be doing in the proper care of the patient. . . . Bleeding and clotting disorders is one such area where bariatric surgeons, hospitalists, and [specialists] work together and are familiar with the standards of care that should be followed . . . when they are dealing with the type of bleeding and clotting disorders experienced by Mrs. McLaren.

By explaining his experience in working on cases like McLaren's, Dr. Grodzin provides a basis for his opinion as to what a hematologist would have recommended.[7]

Moreover, Dr. Grodzin explains that the records he reviewed show that after McLaren's condition became much worse, another physician, Dr. Thrakar, recognized the need to continue McLaren's anticoagulant therapy and consulted with

---

[7] Although Dr. Rice contends on appeal that Dr. Grodzin has not established that he has the knowledge, skill, experience, training or education to provide an opinion regarding the care a hematologist would have recommended, Dr. Rice did not raise a challenge in the trial court to Dr. Grodzin's qualifications to render the opinions in his report.

her hematologist Dr. Rakkhit—just as Dr. Rice should have done. As a result of that consultation, McLaren was kept on anticoagulant therapy. These facts supply an additional basis for Dr. Grozdin's opinion regarding what a hematologist would have recommended if consulted.

Dr. Grodzin's report also references a hearsay statement regarding what Dr. Rakkhit would have recommended, but the addition of that information does not negate the other evidence described above or render the report inadequate. In his original report, Dr. Grodzin noted his understanding that Dr. Rakkhit would state that, had he been consulted, Dr. Rakkhit would not have discontinued the anticoagulant medication. In his supplemental report, Dr. Grodzin explained that his understanding was based on a conversation between McLaren and Dr. Rakkhit. Citing *Jones v. King*, 255 S.W.3d 156 (Tex. App.—San Antonio 2008, pet. denied), Dr. Rice argues that Dr. Grodzin cannot base his opinion on "a hearsay report of a lay witness's interpretation of another physician's opinion." We conclude that *Jones* is not on point.

In *Jones*, the expert's report relied heavily upon an opinion and apparent documentation of another expert to establish causation. 255 S.W.3d at 160. The opining expert, however, did not include any information on the qualifications of the other expert nor attach the actual documentation relied upon. *Id.* The court held that reliance on absent documentation could not cure the deficiencies in the report. *Id.*

Here, Dr. Grodzin explained the information on which he relied, the fact that he agreed with the opinion, and then stated that his opinions "are in no way dependent on what Dr. Rakkhit may have correctly assessed." Unlike the expert in *Jones*, Dr. Grodzin's opinion was not dependent upon absent information.

As the Supreme Court of Texas recently reiterated, an expert report need not "meet the same requirements as the evidence offered in a summary-judgment

16

proceeding or at trial." *Miller*, 536 S.W.3d at 517 (internal quotations omitted); *see Palacios*, 46 S.W.3d at 879; *Garcia*, 462 S.W.3d at 308-09 (holding expert report adequate even though expert relied on affidavit of another expert that appellant claimed was not reliable). And, an expert is permitted to rely on or base his opinion on facts or data not admissible in evidence if it is of a type reasonably relied on by experts in that particular field. *See* Tex. R. Evid. 703; *Kelly*, 255 S.W.3d at 676 (expert could rely on information stated in nurse's report in forming his opinion). Thus, the mere fact that Dr. Grodzin referenced a hearsay statement regarding what Dr. Rakkhit would have recommended does not in itself make the report inadequate. *See Miller*, 536 S.W.3d at 517 (report does not have to meet same requirements as at trial or in summary-judgment proceeding); *Meth. Hosp. v. Shepherd-Sherman*, 296 S.W.3d 193, 200 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (expert report stating what other physician would have done not inadequate because of lack of affidavit or deposition from other physician).

## 2. The chain of causation

Dr. Rice next argues that Dr. Grodzin's opinion does not adequately set forth a chain of causation. As we have previously held, a report may be sufficient as to causation where it states a chain of events leading from a health care provider's negligence to the injury or harm claimed. *See Patel v. Williams*, 237 S.W.3d 901, 906 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Each step in the progression must be explained or supported. *See Shepherd-Sherman*, 296 S.W.3d at 200.

Dr. Rice argues a chain of causation is not shown in this case because Dr. Grodzin did not state that Dr. Rice was the physician who discontinued the anticoagulant medication (that was Dr. Puppala), nor did he explain how consulting with a hematologist would have changed McLaren's outcome. We conclude these criticisms of the report are misplaced for two reasons.

17

First, although Dr. Rice is correct that the report does not state she was the physician making the decision to discontinue the anticoagulant medication, the report does state that Dr. Rice allowed the discontinuation of the medication, thereby causing the injury. Specifically, Dr. Grodzin states: (1) as a hospitalist, Dr. Rice had treatment responsibilities separate and apart from Dr. Puppala and Dr. St. Laurent; (2) surgeons and hospitalists should work as a team to determine the proper treatment of bleeding and clotting disorders; (3) Dr. Rice did not appreciate the need for systematic anticoagulation; and (4) Dr. Rice allowed McLaren's anticoagulation therapy to be discontinued. Thus, contrary to Dr. Rice's contention, Dr. Grodzin does set forth a basis for his opinion that the standard of care required Dr. Rice to appreciate McLaren's need for anticoagulation therapy and work with the other doctors to obtain it.

Second, regardless of whether Dr. Rice made the decision to discontinue anticoagulant therapy, Dr. Grodzin opined that she also breached the standard of care by failing to consult a hematologist regarding McLaren's care. Dr. Grodzin's original and supplemental reports then set out how the failure to appreciate the need for anticoagulation and consult a hematologist worsened McLaren's condition:

> At the time of discharge on March 31, 2014, Dr. Rice noted in her discharge summary that Mrs. McLaren was discharged while off Coumadin. Clearly for [a] patient with a clotting disorder and a foreign body in the inferior vena cava, this combination of events placed Mrs. McLaren at increasing risk for further devastating thrombotic events such as those that ultimately occurred.
>
> * * *
>
> Dr. St. Laurent's and Dr. Puppala's decision to discontinue anticoagulant therapy during this hospitalization and to inappropriately place an IVC filter, without first seeking the assistance of Dr. Rakkhit or another staff hematologist, directly caused the massive portal vein thrombosis for which she was again hospitalized . . . . I mention [this

18

causation] again as an example of my knowledge of . . . the consequences that can occur when one fails to follow the standard of care in failing to seek the assistance of a hematologist in circumstances such as these. That is why the standard of care required Dr. St. Laurent to call in Dr. Rakkhit, or another staff hematologist, who could have assisted in Mrs. McLaren's care by pointing out that the bleeding could be addressed without discontinuing the anticoagulant medication therapy or placing an IVC filter.

\* \* \*

Likewise, if Dr. Rakkhit or another staff hematologist had been called in during the March 24, 2014 admission, as would be required to fulfill the standard of care, Mrs. McLaren would have received appropriate anticoagulation therapy and would not have had placement of an IVC filter. As I describe in detail in my original report, the failure to give Mrs. McLaren appropriate anticoagulation therapy during this hospitalization, coupled with the improper IVC filter, medically caused the massive portal vein thrombosis which necessitated her hospitalization again . . . and the further complications for which she was treated later during her hospitalization at Memorial Hermann Hospital-Memorial City . . . .

After stating the results of the failure to consult a hematologist (i.e. discontinuation of anticoagulant medication and improper placement of IVC filter), Dr. Grodzin then states, specifically with regard to Dr. Rice, that: "the standard of care required Dr. Rice to *also* have either Dr. Rakkhit or a staff hematologist see Mrs. McLaren and provide assistance in managing both the internal bleeding that the CAT scans [she had ordered] showed as well as the DVT and clotting disorder from which Mrs. McLaren was still suffering." (emphasis added). Dr. Rice's failure to meet the standard of care by consulting a hematologist "was medically causative of Mrs. McLaren's continued bleeding, continued clotting problems, and the extensive portal vein thrombosis and the other serious medical problems . . . for which she was [later] hospitalized at Memorial Hermann Hospital-Memorial City . . . ." In this way, Dr. Grodzin set forth the chain of causation and provided support

19

for each link in the chain. *See Shepherd-Sherman*, 296 S.W.3d at 200; *Patel*, 237 S.W.3d at 905-06.

Dr. Rice argues that gaps exist in the chain of causation because the reports do not state that consulting a hematologist at or after the time Dr. Rice first saw McLaren on March 25, 2014 would have made a difference in the outcome. We disagree. Dr. Grodzin states that "if Dr. Rakkhit or another staff hematologist had been called in during the March 24, 2014 admission, as would be required to fulfill the standard of care, Mrs. McLaren would have received appropriate anticoagulation therapy and would not have had placement of an IVC filter." He also stated in his initial report that "[a]t any point, Dr. Rice . . . could have consulted Dr. Rakkhit or any other hematologist for consultation" related to continuing the anticoagulation medication in the face of an intra-abdominal bleed, and because she did not do so, "Mrs. McLaren was left off anticoagulation in an all-or-none fashion which doomed her to inevitable clotting complications such as those from which she suffered."

Dr. Rice cites two cases in which an expert's opinion regarding the failure to consult a more specialized physician was held insufficient to show causation. In *Estorque v. Shafer*, the plaintiff alleged that a physician's failure to consult a urologist and gynecologist related to her abdominal pain led to loss of kidney function and "needless pain and suffering." 302 S.W.3d 19, 28 (Tex. App.—Fort Worth 2009, no pet.). The expert report did not contain any explanation of "how the injuries would not have occurred if [the physician] had obtained consults from a urologist and gynecologist earlier in [plaintiff's] course of treatment." *Id.* at 29. There was no explanation of what the urologist or gynecologist would have done, or recommended, that would have changed the outcome. *See id.* Likewise, in *Tenet Hospitals Ltd. v. Love*, the expert report "was without any medical explanation about whether a consult or transfer would have resulted in different care and treatment, or

a different outcome." 347 S.W.3d 743, 755 (Tex. App.—El Paso 2011, no pet.). Thus the court found an analytical gap existed between the alleged breach of the standard of care and the harm caused. *Id.*

Dr. Grodzin's reports provide the explanation that was missing in the cases on which Dr. Rice relies. Dr. Grodzin sets forth what a hematologist would have recommended (continue anticoagulant therapy and do not place an IVC filter), and how the lack of anticoagulant therapy doomed McLaren to the clotting problems from which she suffered.

To be sure, Dr. Grodzin also opined that other physicians' negligence during the same period contributed to McLaren's injuries. For example, Dr. Grodzin pointed out that it was Dr. Puppala who placed the IVC filter and recommended that McLaren re-start her anticoagulation medication in two to three weeks. But there may be more than one proximate cause of an injury, and in any event the statute does not require McLaren to rule out other possible causes of her injuries at this preliminary stage. *Rouhani v. Morgan*, No. 01-16-957-CV, 2017 WL 3526719, at *6 (Tex. App.—Houston [1st Dist.] Aug. 17, 2017, no pet.) (mem. op.); *Bailey v. Amaya Clinic*, Inc., 402 S.W.3d 355, 369 (Tex. App.—Houston [14th Dist.] 2013, no pet.). As long as the expert report states what each of the doctors, including Dr. Rice, should have done to comply with the standard of care and how the failure to do so caused the injury, the report satisfies the purposes of section 74.351. *See Sanjay*, 252 S.W.3d at 468 (though four doctors participated in caring for patient, report sufficiently stated how doctor's failure to adequately monitor patient's condition caused injury).

We conclude Dr. Grodzin's reports represent a good-faith effort to comply with the statutory definition of an expert report on causation, and therefore the trial court did not abuse its discretion in denying Dr. Rice's motion to dismiss. *See*

21

*Bowie*, 79 S.W.3d at 52.  We overrule Dr. Rice's second and third issues.

## III.    The form of the trial court's order does not show an abuse of discretion.

In her first issue, Dr. Rice argues the trial court abused its discretion because the court's order "failed to refer to any guiding rules or principles."  According to Dr. Rice, the trial court's order denying the motion to dismiss should be reversed for that reason alone.  We construe this issue as a challenge to the form of the trial court's order.

In support of her argument, Dr. Rice cites the decision in *Wright*, 79 S.W.3d at 52.  The *Wright* opinion, however, says nothing about the required form of the trial court's order on a motion to dismiss under section 74.351.  Nor do we find any support for Dr. Rice's argument in the statute itself.  We therefore decline to impose a form requirement for orders denying motions to dismiss under section 74.351.  Dr. Rice's first issue is overruled.

### CONCLUSION

Having concluded that the reports served on Dr. Rice by McLaren satisfy the requirements for expert reports under section 74.351 of the Texas Civil Practice and Remedies Code, we affirm the trial court's order.


/s/     J. Brett Busby
       Justice


Panel consists of Justices Jamison, Busby, and Donovan.

22