**Reversed and Remanded and Opinion filed May 9, 2019.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-17-00479-CV

---

**AIMEE HARVEY INDIVIDUALLY AND AS NEXT FRIEND OF TALISA PHILLIPS, AMANDA HARVEY, HENRY WILSON, III, AS NEXT FRIEND OF AALEISA PHILLIPS (A MINOR), AND GWENDOLYN WILSON, Appellants**

**V.**

**KINDRED HEALTHCARE OPERATING, INC., KINDRED HOSPITAL HOUSTON MEDICAL CENTER, AND KINDRED HOSPITALS LIMITED PARTNERSHIP, Appellees**

---

**On Appeal from the 190th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2014-27575**

---

## OPINION

In this case, we address the adequacy of an expert report under the Texas Medical Liability Act when the only defendants are the hospital and affiliated entities and the expert report does not separately address standard of care, breach

of the standard of care, and causation as to each healthcare provider involved in caring for the patient.[1] We conclude that the expert report is adequate—it represents an objective good faith effort to comply with the Act because the expert opined that the same standard of care was applicable to all involved healthcare providers, none of the healthcare providers complied with that standard, and such failure resulted in the patient's injuries. We further conclude the expert's opinions are not conclusory and the expert is qualified to opine on the standards of care applicable to nonphysician healthcare providers.

Appellants Aimee Harvey, Amanda Harvey, Henry Wilson III, and Gwendolyn Wilson challenge the trial court's dismissal of their medical malpractice claims in favor of appellees Kindred Healthcare Operating, Inc., Kindred Hospital Houston Medical Center (Kindred Hospital), and Kindred Hospitals Limited Partnership (collectively, Kindred).[2] Kindred moved for dismissal on four grounds: (1) appellants' expert is not qualified to opine on the applicable standard of care, breach, or causation; (2) the expert report does not include fair summaries of the standard of care applicable to Kindred, breach of that standard, or causation; (3) the report groups together several unidentified healthcare providers; and (4) the report is conclusory. The trial court granted the motion, dismissed the claims against Kindred, and rendered final judgment. Concluding that the trial court abused its discretion in dismissing the case, we reverse and remand.

### *Background*

Talisa Phillips died while she was a patient at Kindred Hospital. She had

---

[1] *See* Tex. Civ. Prac. & Rem. Code §§ 74.001–.507.

[2] Aimee Harvey appears individually and "as next friend" of Talisa Phillips, who is deceased. We presume for purposes of this opinion that Harvey is a representative of Phillips's estate. Henry Wilson III appears as next friend of Aaleisa Phillips, a minor.

been admitted due to respiratory failure. At the time of her admission, she was awaiting a lung transplant and had cardiac disease. Five days later, Phillips was experiencing shortness of breath and "chest tightness." Upon assessment, a physician discovered that Phillips's "chest tube was kinked." The chest tube was adjusted, which resulted in symptom relief. No follow-up x-ray was taken that day to assess the placement or effectiveness of the chest tube.

The next morning, Phillips went into acute respiratory acidosis, a condition caused by decreased ventilation resulting in increased concentration of carbon dioxide in the blood. She was transferred to the intensive care unit, and a note was placed in her file that she would need extracorporeal membrane oxygenation (ECMO) support if she did not improve. ECMO is a technique that provides cardiac and respiratory support oxygen to patients whose heart and lungs are severely diseased or damaged. Because Kindred Hospital does not provide ECMO services, transfer orders were written that morning for Phillips to be transferred to another hospital. Phillips experienced cardiac arrest while she was in the elevator en route to be transferred. She was rushed back to the ICU while CPR was being performed on her. She was resuscitated but could not be transferred to the other hospital due to her critical condition. She suffered from another cardiac arrest that afternoon and subsequently died.

Phillips's heirs filed a medical malpractice suit, bringing negligence, gross negligence, survival, and wrongful death claims against Kindred. Appellants served two expert reports on Kindred. Kindred objected to the reports and moved to dismiss appellants' claims.[3] The trial court sustained Kindred's objections but

---

[3] In an earlier appeal, appellants challenged the trial court's dismissal of their claims because they had failed to designate expert witnesses before the deadline set by the trial court's docket control order. *Harvey v. Kindred Healthcare Operating, Inc.*, 525 S.W.3d 281, 283 (Tex. App.—Houston [14th Dist.] 2017, no pet.). We reversed, holding that the trial court erred in

3

permitted appellants to serve amended expert reports. Appellants served one amended expert report, prepared by Natascha Dumas, M.D. That expert report is at issue in this appeal.

## *Discussion*

Kindred challenged Dumas's qualifications to opine on the applicable standard of care, breach, and causation, and the reliability of Dumas's opinions. Specifically as to the latter, Kindred maintains that the expert report does not include a fair summary of the standard of care applicable to Kindred, groups together several unidentified healthcare providers, and is conclusory.[4] We discuss each argument in turn.

The Act entitles a defendant to dismissal of a healthcare liability claim if it is not timely served with an expert report showing that the claim has merit. Tex. Civ. Prac. & Rem. Code § 74.351(b); *Scoresby v. Santillan*, 346 S.W.3d 546, 549 (Tex. 2011). We review a trial court's ruling on a healthcare provider's motion to dismiss a healthcare liability claim for an abuse of discretion. *Houston Methodist*

---

dismissing the case for failure to designate experts while a discovery stay was in effect under the Act. *Id.*

[4] Kindred has not established which healthcare providers were its employees and which were not, if any. In Texas, it is well settled that a hospital is generally not vicariously liable for the acts or omissions of a physician who is an independent contractor. *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 862 (Tex. 2009); *Kimbrell v. Memorial Hermann Hosp. Sys.*, 407 S.W.3d 871, 876 (Tex. App.—Houston [14th Dist.] 2013, no pet.). However, the fact that some of the involved parties may have been independent contractors would not be a proper basis for dismissing a healthcare liability claim under the expert report rule. *McAllen Hosps., L.P. v. Gonzalez*, 566 S.W.3d 451, 459 (Tex. App.—Corpus Christi 2018, no pet.) (citing Tex. Civ. Prac. & Rem. Code. § 74.351). That is because the purpose of the expert report requirement is not to prove liability but instead to show before discovery is conducted that a medical liability claim is not baseless. *Id.* We further note that employees and independent contractors of healthcare providers who are acting within the scope of employment or their contractual relationship also qualify as healthcare providers. Tex. Civ. Prac. & Rem. Code § 74.001(12)(B). We thus do not distinguish at this preliminary stage between Kindred's employees and independent contractors. *See McAllen Hosps.*, 566 S.W.3d at 459.

4

*Hosp. v. Nguyen*, 470 S.W.3d 127, 129 (Tex. App.—Houston [14th Dist.] 2015, pet. denied). In the absence of findings of fact or conclusions of law, we uphold a trial court's ruling on a motion to dismiss on any theory supported by the record and infer any necessary findings of fact to support the ruling. *Id.* (citing *Rosemond v. Al–Lahiq*, 331 S.W.3d 764, 766 (Tex. 2011)). A trial court abuses its discretion if it acts in an unreasonable or arbitrary manner or without reference to any guiding rules or principles. *Larson v. Downing*, 197 S.W.3d 303, 304–05 (Tex. 2006) (per curiam); *Bailey v. Amaya Clinic, Inc.*, 402 S.W.3d 355, 361 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

The Act specifies requirements for an adequate report and mandates "an objective good faith effort to comply" with the requirements. Tex. Civ. Prac. & Rem. Code § 74.351(*l*), (r)(6); *Scoresby*, 346 S.W.3d at 549. When determining if a good faith effort has been made, the trial court is limited to the four corners of the report and cannot consider extrinsic evidence. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875, 878 (Tex. 2001); *Bailey*, 402 S.W.3d at 361.

An expert must establish that she is qualified to provide an acceptable report. Tex. Civ. Prac. & Rem. Code § 74.351(r)(5)(B). Qualifications must appear in the expert report and cannot be inferred. *Bailey*, 402 S.W.3d at 361. Accordingly, analysis of expert qualifications is limited to the four corners of the expert's report and the expert's curriculum vitae. *Baylor Coll. of Med. v. Pokluda*, 283 S.W.3d 110, 117 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Additionally, an expert report must provide a fair summary of the expert's opinions regarding (1) the applicable standard of care; (2) the manner in which the care provided failed to meet that standard (breach); and (3) the causal relationship between that failure and the injury, harm, or damages claimed. *See* Tex. Civ. Prac. & Rem. Code

5

§ 74.351(r)(6); *Palacios*, 46 S.W.3d at 879. In compliance with these standards, the expert report must incorporate sufficient information to inform the defendant of the specific conduct the plaintiff has called into question and provide a basis for the trial court to conclude the claims have merit. *Bailey*, 402 S.W.3d at 362 (citing *Palacios*, 46 S.W.3d at 879). A report may not merely contain the expert's conclusions about these elements. *Jelinek*, 328 S.W.3d at 539; *Palacios*, 46 S.W.3d at 879. The expert must explain the basis for her statements and link her conclusions to the facts. *Jelinek*, 328 S.W.3d at 539. However, a plaintiff need not present all the evidence necessary to litigate the merits of her case. *Palacios*, 46 S.W.3d at 879; *Bailey*, 402 S.W.3d at 362. The report may be informal in that the information need not fulfill the same requirements as the evidence offered in a summary judgment proceeding or at trial. *Palacios*, 46 S.W.3d at 879; *Bailey*, 402 S.W.3d at 362.

## I. Dumas Qualified to Opine on Standard of Care for Kindred's Healthcare Providers

Kindred contends that Dumas is not qualified to opine on whether Kindred's nurses departed from accepted standards of care as to patients with chronic respiratory failure or lung transplantation patients. Kindred asserts that under the Act, Dumas could qualify as an expert

> '**only if** [she was] practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider . . . at the time the testimony is given or was practicing that type of health care at the time the claim arose.'

*See* Tex. Civ. Prac. & Rem. Code § 74.402(b)(1) (emphasis added by Kindred).

But in its placement of ellipses, Kindred omitted key language from subsection (b)(1) making that subsection applicable only "if the defendant health care provider is an individual," as follows:

6

[A] person may qualify as an expert . . . only if the person . . . is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, *if the defendant health care provider is an individual*, at the time the testimony is given or was practicing that type of health care at the time the claim arose.

*See id*. (emphasis added).[5] Kindred is not an individual.

We agree that Dumas's qualifications to opine as to acceptable standards of care applicable to nonphysician healthcare providers are governed by section 74.402.[6] *See* Tex. Civ. Prac. & Rem. Code § 74.351(r)(5)(B) (stating that expert for establishing standard of care applicable to nonphysician healthcare provider must meet qualifications of section 74.402). But subsection (b)(1), cited by Kindred, does not apply here since Kindred is not an individual. *Gracy Woods I Nursing Home v. Mahan*, 520 S.W.3d 171, 183 n.56 (Tex. App.—Austin 2017, no pet.); *Doctors Hosp. v. Hernandez*, No. 01-10-00270-CV, 2010 WL 4121678, at *5 (Tex. App.—Houston [1st Dist.] Oct. 21, 2010, no pet.) (mem. op.). Moreover, even if that subsection applied, we note that the issues in this case relate to the fields of respiratory and cardiac arrest and Dumas states in her report that she is certified in cardiac life support and is trained to handle cardiovascular and respiratory emergencies, including post-cardiac arrest care.

Two other statutory requirements under section 74.402 do apply here. First, Dumas must have "knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim." Tex. Civ. Prac. & Rem. Code § 74.402(b)(2). Second,

---

[5] Kindred also omitted this key language in the trial court.

[6] Kindred has not challenged Dumas's qualifications to opine as to physician providers. Such expert qualifications are governed by section 74.401. Tex. Civ. Prac. & Rem. Code § 74.401.

Dumas must be "qualified on the basis of training or experience." *Id.* § 74.402(b)(3). To evaluate the expert's training or experience, we are required to examine whether the expert is "certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim . . . [and] is actively practicing health care in rendering health care services relevant to the claim." *See id.* § 74.402(c) (stating court "shall consider" these two factors).

Kindred argues that Dumas is not qualified to testify regarding "respiratory or pulmonary issues." Appellants are required to establish only that Dumas has "knowledge, skill, experience, training, or education" regarding the specific issue before the court that would qualify the expert to give an opinion on that particular subject. *See Bailey*, 402 S.W.3d at 363 (citing *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996)). Appellants contend that the case is about patient mismanagement and misdiagnosis because Kindred's employees purportedly failed to follow doctor's orders, provide respiratory monitoring, and provide "adequate transfer services in an acute respiratory situation."

As relevant to the issues in this case, Dumas is a board-certified family practice doctor, who is also certified in cardiac life support and trauma life support. She is self-employed and practices in "various emergency rooms, urgent care centers and family practice offices in Houston, Texas." In her curriculum vitae, Dumas listed nearly twenty years' experience working in emergency rooms. Before becoming self-employed, she had been the "Cluster Medical Director" and then the "Houston District Medical Director" for the University of Texas Medical Branch for seven years. In these roles, she supervised primary care providers, including physicians, nurse practitioners, and physician assistants. She also taught

8

nurse practitioners and physician assistants.

Dumas stated in her report that she "deliver[s] a range of acute, chronic and preventative medical care services to patients." Her cardiac life support training includes recognizing and managing "early respiratory and cardiac arrest" and peri-arrest conditions.[7] She is proficient in "airway management [and] pharmacology related to cardiac life support." She is trained to handle the following types of emergencies, among others: cardiovascular, cerebrovascular, respiratory and metabolic, and post-cardiac arrest care. She is trained to support patients suffering from acute trauma. She can assess a patient's condition "rapidly and accurately, resuscitate and stabilize the patient according to priority, and determine if the patient's needs exceed a facility's capacity." She can identify life-threatening thoracic conditions.

Dumas further stated:

My education, training, experience, and knowledge base makes me qualified to testify, as to what Kindred Hospital, Houston, its physicians, nurse practitioners, respiratory therapists, nurses and clinical staff were supposed to do (standard of care), what they did not do (the breach of the standard), and how the breach resulted in harm and the ultimate death (causation) to . . . Phillips . . . .

Appellants' claims are based, in relevant part, on the allegations that Kindred's employees failed to (1) follow the orders of the primary attending physician, (2) develop or implement a care plan for Phillips, (3) set goals for positive outcomes and nursing interventions to prevent adverse outcomes, (4) take steps to prevent infection, and (5) perform ongoing nursing assessments to identify actual and potential problems relating to Phillips's health and safety. These purported failures allegedly resulted in Phillips's death due to acute respiratory

---

[7] Peri-arrest occurs just before or just after a full cardiac arrest.

9

acidosis and cardiac arrest.

A physician is qualified to testify as an expert regarding whether a nonphysician healthcare provider departed from the accepted standards of care when the physician states she is familiar with the standard of care (1) for both nurses and physicians and (2) for the prevention and treatment of the illness, injury, or condition involved in the claim. *Baylor Med. Ctr. at Waxahachie v. Wallace*, 278 S.W.3d 552, 558 (Tex. App.—Dallas 2009, no pet.) (citing *San Jacinto Methodist Hosp. v. Bennett*, 256 S.W.3d 806, 814 (Tex. App.—Houston [14th Dist.] 2008, no pet.)). Moreover, when a physician states that she is familiar with the standard of care and requirements for nonphysician healthcare providers and that she has worked with, interacted with, and supervised such healthcare providers, she is qualified to opine regarding whether the healthcare provider departed from the accepted standards of care. *Id.*

Dumas established that she is qualified to testify as an expert on the issue of the nonphysician healthcare providers' accepted standards of care in this case. She stated that she is familiar with the applicable standard of care for "physicians, nurse practitioners, respiratory therapists, nurses and clinical staff." She stated that she is familiar with prevention and treatment of the illness, injury, and condition involved in the claims in this case as follows: she can recognize and manage "early respiratory and cardiac arrest" and peri-arrest conditions. She is proficient in airway management related to cardiac life support. She can handle emergencies related to cardiovascular, respiratory, and post-cardiac arrest care. She is very experienced in dealing with patients suffering from acute trauma and can assess a patient's condition rapidly, resuscitate and stabilize the patient, and assess whether a patient needs to be transferred to another facility. She is familiar with "life-threatening thoracic conditions." *See Bailey*, 402 S.W.3d at 364 (recognizing that a

10

doctor's statement that she has knowledge of the accepted standard of care for the injury or illness at issue satisfies the expert qualification regarding standards of care); *see also Methodist Hosp. v. Addison*, No. 14-17-00917-CV, 2018 WL 6722348, at *8 (Tex. App.—Houston [14th Dist.] Dec. 21, 2018, no pet.) (holding physician who had not practiced as a surgeon was qualified to opine as to standard of care when he had knowledge, skill, training, and experience and subject of claim fell within his medical expertise). Moreover, Dumas has an extensive background supervising and teaching nurse practitioners and physician assistants. *See Wallace*, 278 S.W.3d at 559 (holding doctor was qualified to opine on accepted standards of care for healthcare providers when "expert report include[d] his specific statement that he ha[d] worked with nurses, nurse practitioners, physician's assistants, and physicians, including emergency room physicians, and he [was] familiar with the standards of care that apply to such health care providers in similar situations").

We conclude that Dumas's expert report establishes that she is qualified to opine on the standards of care applicable to Kindred's nurses and other healthcare providers. She is also qualified to opine on the issues in this case, which involve acute respiratory acidosis and cardiac arrest. *See id.* at 558-59.

## II.      Standards of Care, Breach, and Causation Adequately Addressed

Kindred contends that Dumas did not adequately address standards of care, breach, and causation in her expert report as to each healthcare provider. Specifically, Kindred asserts that Dumas improperly "groups together allegations against various healthcare providers." Kindred further claims that Dumas's opinions are conclusory.

Kindred challenges Dumas's use of the word "or" in several paragraphs in the expert report addressing standards of care, breach, and causation. For example, Dumas said (1) the standard of care required that "the medical director, the house

physician, nurse practitioner, respiratory therapist, nurse, **or** other clinical staff medical and nonmedical . . . follow the orders of the primary attending physician"; (2) "Kindred Hospital, Houston, the medical director, the house physicians, nurse practitioners, respiratory therapists, nurses, **or** other clinical staff medical and nonmedical failed to meet the applicable standards of medical care"; and (3) "[t]he breach in the standard of care by Kindred Hospital, Houston, Dr. Sean Muldoon, the chief medical officer, the medical director, the house physicians, nurse practitioners, respiratory therapists, nurses **or** other clinical staff medical and nonmedical caused Ms. Phillips' acute respiratory failure to worsen, creating the acute respiratory acidosis." (Emphasis added.) According to Kindred, Dumas's use of the conjunction is "fatal" to the expert report because Dumas failed "to put Kindred on notice of what its nurses and staff did wrong."

As an initial matter, we note that we review the sufficiency of an expert report by considering the expert's opinions in the context of the entire report. *Rice v. McLaren*, 554 S.W.3d 195, 201 (Tex. App.—Houston [14th Dist.] 2018, no pet.). We do not take statements in isolation. *Id.* (citing *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 144 (Tex. 2015) (per curiam)). Also, it is well established that grouping different types of healthcare providers together in discussing relevant standards of care does not render an expert report inadequate when the healthcare providers owed the same duties to the plaintiff. *See, e.g., Gonzalez v. Padilla*, 485 S.W.3d 236, 248 (Tex. App.—El Paso 2016, no pet.) ("As we noted previously, both wound care and infection prevention are subjects common to all fields of medical practice."); *Hatchel v. Hacker*, No. 02-13-00218-CV, 2014 WL 1875845, at *3 (Tex. App.—Fort Worth May 8, 2014, no pet.) (mem. op.) ("[W]hether the care was provided by a physician or a nurse practitioner, the standard of care simply required that the infected wound be

12

debrided."); *Bailey*, 402 S.W.3d at 366-67 ("[G]rouping [healthcare providers] together in discussing the relevant standards of care does not render an expert report inadequate when all the [healthcare providers] owed the same duty to the plaintiff."); *Livingston v. Montgomery*, 279 S.W.3d 868, 871-73 (Tex. App.— Dallas 2009, no pet.) (rejecting arguments that expert reports were inadequate because they "'lumped together' all of the doctors and all of the nurses" and that the "trial court should not have permitted [the expert] to identify one standard of care for more than one defendant"); *Methodist Hosp. v. Shepherd-Sherman*, 296 S.W.3d 193, 199 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("There is nothing inherently impermissible about concluding that different health care providers owed the same standard of care . . . and breached that duty in the same way.").

A report that satisfies three requirements is sufficient: it must fairly summarize the applicable standard of care; it must explain how a physician or healthcare provider failed to meet that standard; and it must establish the causal relationship between the failure and the harm alleged. *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013). A report that meets these requirements, even only as to one theory, entitles the claimant to proceed with a suit against the healthcare provider. *Id.* However, a report that merely states the expert's conclusions about the standard of care, breach, and causation does not meet these requirements. *Palacios*, 46 S.W.3d at 879; *Bailey*, 402 S.W.3d at 366.

With these standards in mind, we turn to Dumas's 26-page report.

**Standard of Care**. Dumas opined that Kindred and its healthcare providers were subject to three standards of care: (1) following the orders of the physician in charge of patient care, (2) reasonably providing respiratory care, and (3) providing reasonable transfer services in the event Phillips's medical condition exceeded the

13

capabilities of Kindred. We focus on the first applicable standard of care for purposes of our analysis, as Dumas was only required to meet the expert report requirements as to one theory. *See Potts*, 392 S.W.3d at 630. Dumas articulates that standard of care as follows:

> **<u>Following the Orders of the Physician in Charge of Patient Care</u>**. . . . The standard of care required that, the medical director, the house physician, nurse practitioner, respiratory therapist, nurse, **or** other clinical staff medical and nonmedical, in Kindred . . . follow the orders of the primary attending physician Dr. Vinh Nguyen to take daily chest x-rays to document and monitor the placement of a chest tube inserted in the right torso area of . . . Phillips. . . .

(Emphasis added.)

Although Dumas referred to Kindred and its employees in the disjunctive, we do not agree that in doing so, Dumas improperly "group[ed] together allegations against various healthcare providers." Reading Dumas's statement in context, we construe it as a statement that the same standard of care—following the orders of the physician in charge—applied to Kindred and any of its listed employees—physicians, nurse practitioners, nurses, etc.—who were involved in Phillips's care.[8] Dumas was not required to set out a different standard of care as to each employee because she opined that multiple providers all owed Phillips the same standard of care. *See Bailey*, 402 S.W.3d at 366-67; *see also Univ. of Tex. Med. Branch at Galveston v. Qi*, 370 S.W.3d 406, 413 (Tex. App.–Houston [14th Dist.] 2012, no pet.) (stating that the expert report, which addressed the actions of a doctor and a nurse, needed to either describe the respective standards of care for the doctor and the nurse or state that the same standard of care applied to both the doctor and the nurse). Moreover, notwithstanding whether Dumas should have

---

[8] Dumas included a nonexclusive list of the names of "medical doctors and other providers" who provided care to Phillips.

14

used the word "or," as opposed to the word "and," she was not required to use magic words to articulate the applicable standard of care. *See Addison*, 2018 WL 6722348, at *5.

Kindred cites two cases in support of its argument that "it is inappropriate to group together the standards of care of different healthcare providers": *Longino v. Crosswhite*, 183 S.W.3d 913 (Tex. App.—Texarkana 2006, no pet.), and *Jones v. Ark-La-Tex Visiting Nurses, Inc.*, 128 S.W.3d 393, 395 (Tex. App.—Texarkana 2004, no pet.). In the *Longino* case, the Texarkana Court of Appeals held that the trial court abused its discretion in denying a physician's motion challenging the plaintiff's expert report when the expert failed to distinguish between the conduct of two physicians. 183 S.W.3d at 915. There is no indication from the court's opinion that the expert opined that the same standard of care applied to both physicians. However, we do not agree with the *Longino* court to the extent that it ignored, if it did, the settled rule that different healthcare providers may be grouped together when they owe the same duties to the plaintiff. *See Bailey*, 402 S.W.3d at 366-67. Moreover, the expert in *Longino* failed to opine on *how* the physician breached the standard of care apart from the other physician's conduct. 183 S.W.3d at at 917. Here, Dumas opined that none of the healthcare providers complied with the orders of the physician in charge. Accordingly, as discussed in more detail below, Dumas tied all the healthcare providers' *lack of conduct* to Phillips's injuries.

The facts in *Jones* are further afield from the facts presented here. In the *Jones* case, the plaintiff alleged she was injured during hospitalization and subsequent home healthcare. 128 S.W.3d at 395. The court of appeals affirmed the trial court's dismissal of the case because the plaintiff's expert failed to articulate a standard of care for nurses monitoring a patient at home and did not differentiate

15

between what the hospital did wrong and what the home healthcare nurses did wrong. *Id*. at 397. The expert also did not state that the nurses were responsible for any acts resulting in the plaintiff's injuries. *Id*. Accordingly, the report was inadequate. *Id*. The court of appeals did not hold, as Kindred argues, that it is inappropriate to group together the standard of care as to different healthcare providers when the same standard of care applies.

In addition, in the context of the entire report, we conclude that Dumas has opined that the same standard of care applies to all of the involved healthcare providers. Kindred only challenges Dumas's articulation of the standard of care set forth in the report under the subheading "Applicable Standard of Care." "As with any legal text, in determining whether an expert report sets out the applicable standard of care with sufficient detail, we consider all provisions of the entire document, and not merely the portion contained under a subheading titled 'Standard of Care.'" *Gonzalez*, 485 S.W.3d at 250. This approach comports with the repeated high court admonition that an expert report need only provide a "fair summary" of the expert's conclusions, may be "informal," and need not rise to the level of stringency required at the summary judgment stage. *Id*.

Other portions of the report illuminate what Dumas meant in the "Applicable Standard of Care" section. Dumas elaborated on how Kindred's healthcare providers, to comply with the standard of care, were required to follow the orders of the physician in charge by administering daily chest x-rays to monitor the chest tube location, drainage, and connection:

> The timeliness of the x-ray is vital to preventing a collapsed lung or fluid buildup in the chest wall (pleural effusion), fatty fluid, abscess or pus buildup in the lung or chest, or heart failure. The standard of care requires that after the chest tube insertion, a medical professional [must] order a chest x-ray [to] make sure the tube is in the right place. The chest tube stays in place until x-rays show that all

the blood, fluid, or air has drained from the chest and the lung has fully re-expanded. Chests [sic] [x]-rays are standard practice in emergency categorized chest tube insertions.

> According to the medical records obtained from Kindred . . . **a standing order was written for a daily documentation and monitoring of chest tube location, drainage and connection for . . . Phillips**. . . . The order was written by Vinh Nguyen, MD. The order was acknowledged by K. Perez, RN, an employee of Kindred . . . . The order put in place by Dr. Nguyen directed the Kindred staff, physicians, nurse practitioners, respiratory therapists, nursing staff **and** any other providers **to administer a chest x-ray on a daily basis**.

(Emphasis added.) The last quoted sentence, with its use of the word "and," clearly establishes that, according to Dumas, the standard of care required *all* the healthcare providers involved in Phillips's care to comply with Nguyen's standing order.

As to whether the report is conclusory, we conclude that it is sufficiently detailed as to the standard of care for two reasons: First, this case involves healthcare providers who purportedly failed to comply with the standing orders of the physician in charge, which is a subject that applies in all areas of medicine and particularly to all the healthcare providers involved in Phillips's care. *See id.* (explaining that treatment of infection and wounds is common to all areas of medicine and thus the applicable standard of care was common to all physicians). Second, the report, when read as a whole, reveals that the statements regarding standard of care go beyond general, conclusory statements that Kindred's healthcare providers should follow the orders of the physician in charge. *See id.* at 251. Dumas clearly articulated that the healthcare providers involved in Phillips's care were required to administer daily chest x-rays to monitor the chest tube location, drainage and connection for Phillips. Accordingly, Dumas provided

sufficient detail to provide Kindred with notice of what the standard of care is. *See id*. We turn to breach of the standard of care.

**Breach of Standard of Care**. Kindred again complains that Dumas, through her use of the word "or," did not articulate who breached the standard of care; specifically, Kindred posits that Dumas's opinions on breach do not "put Kindred on notice of what its nurses and staff did wrong." Kindred also asserts that Dumas's opinions as to breach are conclusory. We disagree.

Dumas opined generally that Kindred's employees breached the standard of care when they failed to follow Nguyen's orders. But she elaborated:

- The initial chest x-ray examination occurred on 2/21/2012 . . . . The next [x-ray was] on 2/24/2012 . . . . [T]he next chest x-ray was conducted three days later on 2/27/2012 [after] Phillips complained of "chest tightness" in conjunction with shortness of breath and began experiencing elevated pulse rate [and] blood pressure . . ., increased breathing rate . . . and decreased oxygen saturation . . . . [That day], Phillips['s] physician documented[ed] "chest tube was kinked" . . . . The chest x-ray that was conducted on 2/27/2012 was allegedly conducted . . . before the kink in the tube was discovered . . . . According to the medical records . . . , the kinked chest tube caused a "change of condition. . . ."

- [T]here is no evidence of a radiology order to confirm chest tube placement *after* this incident . . . .

- The medical records of Kindred . . . do not display notes from any other discipline of medicine conducting chest x-rays except on 2/22/2012, 2/24/2014 [sic], 2/27/2012 and 2/28/2012[,] the date in which Ms. Phillips had to be intubated and revived from death because of acute respiratory failure and acidosis resulting from the breach in the standard of care.

- The medical records do not describe an entry by any other medical or nonmedical provider illustrating an intervention whereby the chest tube was removed. Therefore, **the chest x-**

18

**rays should have been conducted daily**, until the day [Phillips] was discharged . . . .

- In all medical probability, based on my training and direct experience, Dr. Nguyen ordered the chest x-ray regimen to prevent a breach of the standard of care from taking place and to assure proper and accurate chest tube placement. No other provider made notations of any reason why the order should not be fulfilled, daily. Therefore, **all non-medical staff governed by this order, employees and nonemployees of Kindred, fell below the standard of care**. As a result, the standard of care was breached. The standard of care, [which] requires regular checking of the tube, by the airway management professional, in a manner similar to monitoring patient's vital signs, is absolutely necessary, particularly when blood gas analysis results indicate respiratory diminution. **It is a breach of the standard of care [that] this did not occur as ordered**.

- A properly positioned chest tube must be confirmed by chest x-ray. Based on the medical records, [that is] the most effective manner at the disposal of the physician(s), nurse practitioner, respiratory therapists, nurses **and** clinical staff to determine proper insertion and placement. . . .

- **Not one of the listed or non-listed providers obeyed or fulfilled the standing order of Dr. Nguyen** . . . .

- Dr. Nguyen entered an order, **directed at the nursing staff and likely, the respiratory therapists[.] [B]oth groups . . . are employees of Kindred** . . . . Disobedience of Dr. Nguyen's order created negligent . . . monitoring of chest tube placement and . . . resulted in serious complications and a breach in the standard of care.

(Emphasis added.)

First, Dumas explained that *none* of the healthcare providers involved in Phillips's care complied with Nguyen's order to take daily chest x-rays to document and monitor the placement of the chest tube. The expert report thus put

Kindred on notice of what care was required but not given. *See Weatherford Tex. Hosp. Co., LLC v. Laudermilt*, No. 02-17-00075-CV, 2017 WL 4974778, at \*3 (Tex. App.—Fort Worth Nov. 2, 2017, no pet.) (mem. op.) (holding that expert reports were adequate even when they did not address nurses' breaches of the standard of care separately because such breaches were based on the failure by *all* the nurses to make proper documentation). Although Dumas did not address each healthcare provider's failures separately, the report put Kindred on notice of how Dumas believes the healthcare providers breached their duties. *See id*. The failure of the healthcare providers to comply with Nguyen's orders makes it difficult, if not impossible, for Dumas to determine which healthcare provider did what, particularly at this preliminary stage of the litigation before discovery has been conducted. *See id*. But Dumas opined that the healthcare providers all had a duty to comply with Nguyen's orders and that was not done. *See id*.

Second, Dumas explained in detail why such failure was a breach of the standard of care: regular checking of the tube is "absolutely necessary, particularly when blood gas analysis results indicate respiratory diminution," as here; the "most effective manner" to determine proper insertion and placement of the chest tube is through daily chest x-rays as ordered by Nguyen; failure to take daily chest x-rays resulted in serious complications and a breach in the standard of care. Accordingly, the report is not conclusory as to the purported breach of the applicable standard of care. *See Gonzalez*, 485 S.W.3d at 251-52.

**Causation**. Kindred finally argues that there is no causal link articulated in the expert report between any breaches of the standard of care by specific Kindred personnel and Phillips's alleged injury, again based on the fact that Dumas grouped together several unidentified healthcare providers. As we have concluded, Dumas was not required to articulate who did what at this preliminary stage because the

20

same standard of care applied to all healthcare providers involved in Phillips's care and the purported breaches of the standard of care were based on the failure to comply with Nguyen's orders. Thus, none of the listed healthcare providers allegedly complied with the standard of care. Similarly, Dumas provided Kindred with adequate notice of her opinion that the breaches of the standard of care caused Phillips's injuries.

An expert report must include a fair summary of the expert's opinions regarding the causal relationship between the failure of the healthcare provider to provide care in accord with the pertinent standard of care and the injury, harm, or damages claimed. *Bailey*, 402 S.W.3d at 369 (citing Tex. Civ. Prac. & Rem. Code § 74.351(r)(6)). Under the Act, an expert must explain, based on the facts set forth in the report, how and why a healthcare provider's breach of the standard of care caused the injury. *Peabody v. Manchac*, 567 S.W.3d 814, 821 (Tex. App.—Houston [14th Dist.] Dec. 27, 2018, no pet.) (citing *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 459-60 (Tex. 2017)). A bare expert opinion that the breach caused the injury is not enough. *Id*. A plaintiff who cannot prove that her injury was proximately caused by the defendant's breach of the standard of care does not have a meritorious claim. *Id*. Proximate cause includes the elements of foreseeability and cause in fact. *Id*. To determine whether the expert's causation conclusions are detailed enough, as with standard of care and breach, we read the expert's conclusions on causation in the context of the entire report, not piecemeal or in a vacuum. *Gonzalez*, 485 S.W.3d at 252 (citing *Bakhtari v. Estate of Dumas*, 317 S.W.3d 486, 496 (Tex. App.—Dallas 2010, no pet.)).

Dumas opined that Phillips suffered chest tightness, shortness of breath, increased blood pressure and breathing, and decreased oxygen saturation that was

caused by a "kinked" chest tube. Her last x-ray before the discovery of the kinked chest tube was on February 24, 2012. The kinked chest tube was discovered three days later. Adjusting the tube relieved her symptoms. However, Phillips's status became unstable shortly thereafter, resulting in "cardiac and respiratory distress/failure." According to Dumas, Phillips's decline towards death began with the healthcare providers' failure to administer daily x-rays, which resulted in the delayed discovery of the kinked chest tube. In addition, after the chest tube was adjusted, an x-ray was not taken "to assure proper operation and/or placement of the installed chest tube" until *after* Phillips was already in acute respiratory acidosis the next day. This breach of the standard of care caused Phillips' condition to worsen, "creating the acute respiratory acidosis." Dumas concluded that, among other things, "it is very likely that a subsequent chest x-ray" after the kinked chest tube was discovered

> would have revealed a failing chest tube and the reason for Ms. Phillips' rapidly declining respiratory status would have been revealed . . . when she was . . . still able to withstand transport to a unit that employed ECMO. . . . [The healthcare providers] further [con]tributed to the death of . . . Phillips by not following Dr. Nguyen's orders . . . ."

In summary, but for the healthcare providers' failure to follow Dr. Nguyen's order to administer daily chest x-rays, Phillips would not have experienced acute respiratory acidosis and likely would not have died. *See Peabody*, 567 S.W.3d at 828.

We conclude that Dumas fairly summarized the causal relationship between the failure of Kindred's healthcare providers to follow Nguyen's orders and Phillips's injuries. *See id.* at 835-36 (holding that expert opinion on causation was adequate when expert opined, among other things, that patient would not have died if he had been admitted to hospital and closely monitored on "cardiac telemetry

22

monitoring" for heart valve insufficiencies); *see also Gonzalez*, 485 S.W.3d at 252-53 (holding expert report was adequate as to causation when expert opined that the "failure to timely establish an appropriate treatment plan which provided for infection prevention" caused patient to develop infection resulting in amputation of his leg).

We sustain appellants' sole issue.

## *Conclusion*

Dumas's expert report represents an objective good faith effort to comply with the statutory requirements for an expert report for four reasons: (1) Dumas is qualified to opine on the standards of care applicable to Kindred's nurses and other healthcare providers; (2) Dumas opined that the same standard of care was applicable to all the involved healthcare providers and provided adequate detail to provide Kindred with notice of what the standard of care was; (3) Dumas explained that *none* of the healthcare providers involved in Phillips's care complied with the standard of care requiring them to follow the orders of the physician in charge, and she explained in detail why such failure was a breach of the standard of care; and (4) Dumas fairly summarized the causal relationship between the failure of the healthcare providers to follow the orders of the physician in charge and Phillips's injuries. Accordingly, we hold that the trial court abused its discretion in granting Kindred's motion to dismiss. We reverse the trial court's judgment and remand the case to the trial court for further proceedings.

/s/     Frances Bourliot
        Justice

23

Panel consists of Justices Christopher, Bourliot, and Spain.