

# NUMBER 13-18-00165-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

WILLIAM J. NORBERG JR.,
M.D., ET AL.,                                                    Appellants,

v.

ALEXIS AMEEL, PIETER AMEEL,
AND ACACIA AMEEL,                                               Appellees.

### On appeal from the 206th District Court
### of Hidalgo County, Texas.

# MEMORANDUM OPINION

### Before Justices Benavides, Hinojosa, and Tijerina
### Memorandum Opinion by Justice Tijerina

Appellants Vangala J. Reddy, M.D., William J. Norberg, Jr., M.D., Krishna M.

Turlapati, M.D., Ana Hernandez Almeda, M.D., Frank W. Sabatelli, M.D., and Irene V.

Perez Young, M.D. appeal the trial court's order denying their motions to dismiss a

healthcare liability claim brought by appellees Alexis Ameel, Pieter Ameel,[1] and Acacia Ameel. In a single issue, appellants assert the trial court erred in denying their motions to dismiss because the Ameels' expert reports failed to comply with § 74.351 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351. We reverse and remand in part and affirm in part.

## I. BACKGROUND

On May 9, 2015, sixteen-year-old Alexis was admitted to the emergency department at Doctor's Hospital at Renaissance (DHR) after being diagnosed with deep-vein thrombosis (DVT) at Valley Baptist Medical Center.[2] After a thirteen-day stay at DHR, during which she was treated by appellants, Alexis was flown from DHR to Texas Children's Hospital (TCH) in Houston. At TCH, physicians performed a pulmonary angiogram, and she was diagnosed with Catastrophic Antiphospholipid Syndrome (CAS) and pulmonary emboli (PE).[3] After three weeks of undergoing multiple surgical procedures, Alexis was discharged.

On May 8, 2017, the Ameels filed their original petition and request for disclosure, alleging appellants were negligent in failing to detect and diagnose Alexis with PE, and as a result of appellants' negligence, Alexis suffered catastrophic injuries. On September 15, 2017, the Ameels filed two expert reports by Michael Tsifansky, M.D. and S. Robert Hurwitz, M.D. in accordance with § 74.351. *See id*. § 74.351(a) ("In a health care liability claim . . . a claimant shall . . . serve on [a defendant physician] one or more expert reports,

---

[1] Since the filing of this appeal, Pieter Ameel has passed away. However, appellees filed a suggestion of death and do not believe any substitution of parties is necessary. We agree.

[2] DVT is a deep-vein blood clot in the leg.

[3] DVT in the lower extremities often spreads to the chest creating PE, according to Dr. Tsifansky's expert report.

2

with a curriculum vitae of each expert listed in the report."). The experts opined, among other things, that appellants "failed to order, recommend, or perform a single pulmonary CT angiogram (or invasive pulmonary angiogram) throughout [Alexis's] stay at DHR" and that Alexis's pain, impairment, and multiple surgical procedures were a result of appellants' failures.

Appellants filed their objections to the expert reports and motions to dismiss, contending that the expert reports did not represent a "good faith" effort to comply with the statute. *Id*. § 74.351(l) ("A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report . . . ."). After a hearing, the trial court overruled appellants' objections and denied the motions to dismiss. This interlocutory appeal followed. *See id*. § 51.014(a)(9) (authorizing an appeal of an interlocutory order denying a motion to dismiss for failure to file a medical expert report under the Texas Medical Liability Act).

## II. DISCUSSION

Appellants assert the trial court erred in denying their motions to dismiss because the expert reports: (1) "fail to set out the specific standards of care"; (2) fail to set out "deviations from that nonspecific standard of care"; and (3) inadequately explain "the causal relationship between appellants alleged breaches" and Alexis's injuries.[4] Appellants also allege that the opinions in the expert reports are conclusory. Drs. Norberg, Turlapati and Almeda additionally challenge Dr. Hurwitz's qualifications, but we first address whether Dr. Tsifansky's expert report meets the statutory requirements.

---

[4] We note that Drs. Sabatelli, Young, and Reddy only challenge this element.

3

**A. Chapter 74 Expert Report**

In a suit against a physician, a plaintiff is required to serve on defendants one or more expert reports within 120 days of a defendant physician's answer that fairly summarizes: (1) the applicable standard of care; (2) how the defendant physician failed to meet that standard; (3) and the causal relationship between the defendant physician's breach and the plaintiff's injury. *Id*. § 74.351(a), (r)(6); *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013). A report that satisfies these requirements, even if as to one theory only, entitles the plaintiff to proceed with a suit against the defendant physician. *Potts*, 392 S.W.3d at 630. "The expert report requirement is a threshold mechanism" for the trial court to conclude that the plaintiff's claims have merit. *Id.* at 631.

First, the report must inform the defendant of the specific conduct the plaintiff has called into question and must provide a basis for the trial court to conclude that the claims have merit. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001). "It need not cover every alleged liability theory to make the defendant physician aware of the conduct at issue, but it must sufficiently describe the defendant physician's alleged conduct." *Potts*, 392 S.W.3d at 631. If the trial court determines that a liability theory is supported, then the claim is not frivolous, and the plaintiff's suit may proceed. *Id*.

**B. Standard of Review**

We review a trial court's decision with respect to chapter 74 expert reports for an abuse of discretion. *Omaha Healthcare Ctr., LLC v. Johnson*, 344 S.W.3d 392, 398 (Tex. 2011); *Larson v. Downing*, 197 S.W.3d 303, 304–05 (Tex. 2006); *Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006)*; Palacios*, 46 S.W.3d at 877. The trial court abuses its

4

discretion if it acts unreasonably, arbitrarily, or without reference to any guiding rules or principles. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015). In our review of an expert report, we are limited to the contents contained within the four corners of the report in determining whether the report manifests a good faith effort to comply with the statutory definition of an expert report. *Palacios*, 46 S.W.3d at 878.

## C.    Analysis

### 1.    Applicable Standard of Care.

Dr. Tsifansky provided the following in his expert report:

Defendants Frank Sabatelli, M.D., Irene Perez-Young, M.D., and Vangala Reddy, M.D. were [Alexis's] treating interventional radiologists during her stay at DHR. Defendants William Norberg, Jr., M.D., Krishna M. Turlapati, M.D., and Ana Hernandez Almeda M.D. were [Alexis's] treating attending physicians at DHR.

As outlined above, [Alexis] presented to DHR with a diagnosis of DVT in the right leg. As outlined above, multiple DVT, both occlusive and non-occlusive, were noted throughout [Alexis's] stay at DHR. As outlined above, [Alexis] also presented to DHR with symptoms consistent with Crohn's Disease, which is a clot-forming condition, and later developed [CAS] also a clot-forming condition. Also, as noted above, [Alexis] manifested symptoms, which the Defendants noted, of tachycardia, high thrombus load, blood in urine and vomit, and a generally and gravely deteriorating condition before being life-flighted to [TCH] in Houston.

The standard of care for attending physicians and interventional radiologists like the individually-named Defendants in this case is to consider whether PE may be present in the unwell (and especially gravely deteriorating) patient, like [Alexis], with known DVT and to order, perform, or recommend the performance of a pulmonary CT angiogram (or an invasive pulmonary angiogram). These simple tests (that is, a pulmonary CT angiogram or an invasive pulmonary angiogram) would have detected and therefore allowed for the removal of PE present in [Alexis's] chest, either emboli that had spread from her DVT or emboli created in her chest by nature of her Crohn's Disease or otherwise. All of the above-named Defendants (who were [Alexis's] treating attending physicians and interventional radiologists at DHR) failed to order, recommend, or perform a single indicated pulmonary CT angiogram following Dr. Norberg's ordered chest x-ray on May 9, 2015 (the initial date of admission).

5

Defendants Sabatelli, Perez-Young, Reddy, Norberg, Turlapati, and Almeda each therefore breached this applicable standard of care by failing to order, recommend, or perform a single pulmonary CT angiogram (or invasive pulmonary angiogram) throughout [Alexis's] stay at DHR, in spite of her diagnosed right leg DVT, symptoms consistent with Crohn's Disease, tachycardia, and gravely deteriorating overall clinical condition.

. . .

As noted above, the standard of care applicable to Defendants required them to regularly (that is, daily) consider the presence of PE in a critically-ill patient with DVT, and to [sic] a pulmonary CT angiogram or an invasive angiogram whenever PE is suggested by clinical findings or suspicion, so as to be able to timely detect, and therefore remove, life-threatening PE. Had the identified Defendants ordered, recommended, or performed the aforementioned imaging studies (after Dr. Norberg's sole chest x-ray ordered on May 9, 2015), [Alexis's] multiple PE and related injuries would have been diagnosed far sooner than they were, which would have negated the necessity for her life-flight to [TCH], her multiple surgical procedures performed at [TCH], and the pain and impairment she suffered from the time of the creation of the emboli up to and following her ultimate discharge from [TCH].

The report goes on to describe what occurred during Alexis's stay at DHR and what appellants performed or failed to perform.

Drs. Norberg, Turlapati, and Almeda argue that the expert report "do[es] not distinguish, or even attempt to distinguish, between the different categories of health care providers, nor do[es] [it] distinguish between the various physicians themselves" in reference to the applicable standard of care.[5] However, in his report, Dr. Tsifansky opined that "[t]he standard of care for attending physicians and interventional radiologists like the individually-named [appellants] is to consider whether PE may be present . .. ." and "to order, perform, or recommend the performance of a pulmonary CT angiogram or invasive pulmonary angiogram." Additionally, Dr. Tsifansky named all appellants as

[5] We note that the remaining appellants do not make this argument on appeal.

6

having failed to meet this standard of medical care: "Sabatelli, Perez-Young, Reddy, Norberg, Turlapati, and Almeda each therefore breached this applicable standard of care . . . ." Dr. Tsifansky was not required to set out a different standard of care as to each physician because he opined that all appellants—attending physicians and interventional radiologists—owed Alexis the same standard of care. *See Bailey v. Amaya Clinic, Inc.*, 402 S.W.3d 355, 361 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *see also Univ. of Tex. Med. Branch at Galveston v. Qi*, 370 S.W.3d 406, 413 (Tex. App.— Houston [14th Dist.] 2012, no pet.) (stating that the expert report, which addressed the actions of a doctor and a nurse, needed to either describe the respective standards of care for the doctor and the nurse or state that the same standard of care applied to both the doctor and the nurse).

Although Dr. Tsifansky referred to appellants collectively throughout his report, we do not agree that in doing so Dr. Tsifansky failed "to present the standards of care relevant to each [appellant]." Grouping different types of healthcare providers together in discussing relevant standards of care does not render an expert report inadequate when the healthcare providers owed the same duties to the plaintiff. *Harvey v. Kindred Healthcare Operating, Inc.*, 578 S.W.3d 638, 648 (Tex. App.—Houston [14th Dist.] 2019 no pet.) (holding that "grouping different types of healthcare providers together in discussing relevant standards of care does not render an expert report inadequate when the healthcare providers owed the same duties to the plaintiff"); *Bailey*, 402 S.W.3d at 366–67 (same); *Livingston v. Montgomery*, 279 S.W.3d 868, 871–73 (Tex. App.—Dallas 2009, no pet.) (rejecting arguments that expert reports were inadequate because they "'lumped together' all of the doctors and all of the nurses" and that the "trial court should

7

not have permitted [the expert] to identify one standard of care for more than one defendant"); *Methodist Hosp. v. Shepherd-Sherman*, 296 S.W.3d 193, 199 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("There is nothing inherently impermissible about concluding that different health care providers owed the same standard of care . . . and breached that duty in the same way."). We therefore reject Drs. Norberg, Turlapati, and Almeda's argument.

**2.      Breach of the Standard of Care**.

Next, appellants assert that the expert report fails to set out deviations from the applicable standard of care. Dr. Tsifansky states that Drs. Sabatelli, Perez-Young, and Reddy performed doppler ultrasounds on Alexis's right leg, and all their findings showed multiple DVT present in the right leg. Moreover, appellants noted her condition was worsening while she experienced a high suspicion of heparin-induced thrombocytopenia, nausea and vomiting, and tachycardia; her leg was more swollen and contained more fluid. Additionally, Alexis now had blood in her urine and was vomiting blood with an abnormally high heart rate. Despite Alexis manifesting symptoms consistent with PE, according to Dr. Tsifansky's expert report, appellants failed to perform the required angiograms while she gravely deteriorated before being flown to TCH. Dr. Tsifansky also explained in detail why appellants' failure was a breach of the applicable standard of care: an angiogram would have detected and therefore allowed for the removal of the PE present in Alexis's chest. Thus, Dr. Tsifansky's report put each appellant on notice of how he believed appellants breached the applicable standard of care. Because the expert report sufficiently put appellants on notice of what care was allegedly required but not given, it sufficiently sets out a standard of care and a breach of that standard. *See*

8

*Columbia N. Hills Hosp. Subsidiary, L.P. v. Alvarez*, 382 S.W.3d 619, 629 (Tex. App.—

Fort Worth 2012, no pet.).

Dr. Norberg however, treated Alexis the day she arrived at DHR, May 9, 2015. In

his report, Dr. Tsifansky states:

> Defendant William J. Norberg, Jr., M.D. admitted [Alexis] to DHR on May 9, 2015, began a heparin drip, diagnosed her with DVT with undetermined etiology, and recommended an ultrasound for evaluation with consideration of intervention and a continued heparin drip . . . Dr. Norberg ordered a single chest x-ray on the date of admission, *which did not reveal anything out of the ordinary.*

(Emphasis added). According to Dr. Tsifansky's report, it appears Dr. Norberg did

not evaluate or treat Alexis on any other day.

> All of the above-named Defendants (who were [Alexis's] treating attending physicians and interventional radiologists at DHR) failed to order, recommend, or perform a single indicated pulmonary CT angiogram following Dr. Norberg's ordered chest x-ray on May 9, 2015 (the initial date of admission)
>
> . . .
>
> The chest x-ray ordered by Dr. Norberg on the date of admission (May 9, 2015) did not reveal any PE present at that point.
>
> . . .
>
> Had the identified Defendants ordered, recommended, or performed the aforementioned imaging studies (*after Dr. Norberg's sole chest x-ray ordered on May 9, 2015*) . . . .

(Emphasis added). Dr. Tsifansky's report does not explain how Dr. Norberg, who was

not present when Alexis manifested the various symptoms referenced above, breached

the standard of care. Specifically, Dr. Tsifansky does not explain why Dr. Norberg should

have ordered the required angiograms when the chest x-ray did not reveal anything out

of the ordinary and Dr. Norberg only treated Alexis the day of her admission. Therefore,

9

we conclude that Dr. Tsifansky's report is deficient in this regard.[6] We sustain Dr. Norberg's sole issue.

### 3. Causation and Injury.

Lastly, appellants argue that Dr. Tsifansky's report "grossly fails to establish the required causal link between [appellants'] alleged breaches." As to causation, an "expert must explain, based on facts set out in the report, how and why" a health care provider's breach proximately caused the injury. *Columbia Valley Healthcare Sys., LP v. Zamarripa*, 526 S.W.3d 453, 459–60 (Tex. 2017). A report should explain how the defendant physician's action or inaction caused injury. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 53 (Tex. 2002). A court may not fill in gaps in a report by drawing inferences or guessing what the expert meant or intended. *Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex. App.—Austin 2007, no pet.). Furthermore, causation may not be inferred. *Castillo v. August*, 248 S.W.3d 874, 883 (Tex. App.—El Paso 2008, no pet.).

Dr. Tsifansky's report addressed the issue of causation. First, Dr. Tsifansky addressed the standard of care applicable to appellants:

> the standard of care applicable to Defendants required them to regularly (that is, daily) consider the presence of PE in a critically-ill patient with DVT, and to a pulmonary CT angiogram or an invasive angiogram whenever PE is suggested by clinical findings or suspicion, so as to be able to timely detect, and therefore remove, life-threatening PE.

In a section titled "CAUSAL CONNECTION BETWEEN BREACHES OF THE STANDARDS OF CARE AND ALEXIS AMMEL'S INJURIES," Dr. Tsifansky opines:

---

[6] In his expert report, Dr. Hurwitz states that Dr. Norberg, as Alexis's admitting attending physician, "ordered a single chest x-ray on May 9, 2015, which did not reveal any abnormalities." Like Dr. Tsifansky, Dr. Hurwitz does not address whether Dr. Norberg treated Alexis after this date. Specifically, Dr. Hurwitz does not explain why Dr. Norberg should have ordered the required angiograms when the chest x-ray did not reveal any abnormalities. Accordingly, we conclude Dr. Hurwitz's report fails to address how Dr. Norberg breached the applicable standard of care.

10

These simple tests (that is, a pulmonary CT angiogram or an invasive pulmonary angiogram) would have detected and therefore allowed for the removal of pulmonary emboli present in [Alexis's] chest, either emboli that had spread from her DVT or emboli created in her chest by nature of her Crohn's Disease or otherwise.

. . .

Had the identified [appellants] ordered, recommended, or performed the aforementioned imaging studies (after Dr. Norberg's sole chest x-ray ordered on May 9, 2015), [Alexis's] multiple PE and related injuries would have been diagnosed far sooner than they were, which would have negated the necessity for her life-flight to TCH, her multiple surgical procedures performed at TCH, and the pain and impairment she suffered from the time of the creation of the emboli up to and following her ultimate discharge from TCH.

In our view, Dr. Tsifansky's explanation provides a straightforward link between appellants' alleged breach of the standard of care and Alexis's injury. Dr. Tsifansky asserted that the DVT in the lower extremities, in this case in Alexis's leg, often spreads to the chest, creating PE. Dr. Tsifansky explained how appellants' breach—failing to order, perform, or recommend performance of angiograms, particularly considering her worsening condition—caused a delay in diagnosis and proper treatment and why that delay caused the issues that led to her life-flight and medical procedures at TCH. *See Abshire v. Christus Health Southeast Texas*, 563 S.W.3d 219, 226 (Tex. 2018) (holding that with respect to causation, our "role is to determine whether the expert has explained how the negligent conduct caused the injury"); *Miller v. JSC Lake Highlands Operations* 536 S.W.3d 510, 512 (Tex. 2017) (holding that that there was a "more-than-adequate summary" of causation where the expert explained how the physician's breach—failing to identify the illness—delayed timely removal, which in turn caused the patient to aspirate).

Appellants argue that because Dr. Tsifansky's expert report does not provide a date on which Alexis's PE was detected, it is not a good faith effort to establish causation. We disagree. An expert report "does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Miller*, 536 S.W.3d at 517. Although Dr. Tsifansky's expert report does not give an exact date Alexis's PE developed, he clearly opines that she manifested symptoms while under appellants' care—diagnosis DVT; iron-deficient anemia; chronic gastritis; weight loss of over twenty pounds in two months; high suspicion of heparin-induced thrombocytopenia, nausea and vomiting, significant tachycardia, edematous, hematuria, and hematemesis—which should have prompted appellants to perform or order the required angiograms. *See Fagadau v. Wenkstern*, 311 S.W.3d 132, 139 (Tex. App.—Dallas 2010, no pet.) (rejecting the contention that the expert report was conjectural with respect to causation because there was no indication of the exact date the patient's retinal detachment occurred; although the expert's report did not give an exact date, the expert opined that an examination would have prevented the detachment). Thus, according to Dr. Tsifansky, performing the required angiograms would have, in all medical probability, detected the presence of PE and therefore allowed for the removal of it, negating the necessity of her life-flight to TCH and preventing the subsequent invasive procedures. *See Patterson v. Ortiz*, 412 S.W.3d 833, 839–40 (Tex. App.—Dallas 2013, no pet.) (concluding that the expert report sufficiently showed that performing the required tests would have led to the diagnosis of pneumonia, and early treatment would have more likely than not saved his life); *Gelman v. Cuellar*, 268 S.W.3d, 123, 130 (Tex. App—Corpus Christi–Edinburg 2008, pet. denied) (holding an expert report adequate regarding the breach of standard of care

12

and causation because it explained that if patient had "been properly monitored and timely treated post-operatively with aggressive respiratory care, she would not have developed respiratory insufficiency," which caused her "anoxic brain damage"); *In re Barker*, 110 S.W.3d 486, 491 (Tex. App.—Amarillo 2003, orig. proceeding) (concluding an expert report sufficient because it explained negligent failure to recognize medical condition and delay in treatment increased severity of plaintiff's injuries). Therefore, we conclude the report adequately links Dr. Tsifansky's conclusion with the underlying facts: the failure to perform angiograms was a substantial factor in Alexis's delayed treatment and subsequent injury.

**D.    Summary**

As to whether the report is conclusory, we conclude that it is sufficiently detailed as to (1) inform appellants of the conduct called into question and (2) allow the trial court to conclude the Ameels' claims have merit. *See Palacios*, 46 S.W.3d 873 at 879. Dr. Tsifansky clearly articulated that appellants were required to perform or order an angiogram and how the failure to do so in all medical probability allowed the progression of Alexis's PE, causing her to undergo multiple surgical procedures—with the exception of Dr. Norberg. *See Zamarripa*, 526 S.W.3d at 460 (holding that the expert need not prove the entire case or account for every known fact; the report is sufficient if it makes "a good-faith effort to explain, factually, how proximate cause is going to be proven"). Because expert reports are simply a preliminary method to show that a plaintiff has a viable cause of action that is not frivolous, we hold that Dr. Tsifansky's expert report represents an objective good faith effort to inform appellants of the causal relationship between the failure to adhere to the pertinent standard of care and the injury, harm, or

13

damages claimed.  *See* TEX. CIV. PRAC. & REM. CODE. ANN. § 74.351(l).  Therefore, we conclude that the trial court did not abuse its discretion when it denied Drs. Reddy, Turlapati, Almeda, Sabatelli, and Young's motions to dismiss based on their complaints that Dr. Tsifansky's report was deficient.  We overrule appellants' issue.  However, because we have concluded that Dr. Tsifansky's expert report does not address how Dr. Norberg breached the standard of care, we hold that the trial court abused its discretion by denying his motion to dismiss.  *See Van Ness*, 461 S.W.3d at 142.

**E.    Dr. Hurwitz**

Drs. Turlapati and Almeda challenged Dr. Hurwitz's expert report by arguing that he is not qualified.  Because we determined that Dr. Tsifansky's expert report complies with § 74.351, we do not need to address appellants' complaints regarding Dr. Hurwitz as those complaints are not dispositive.  *See* TEX. R. APP. P. 47.1; TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (providing that an expert report "is not admissible in evidence by any party; shall not be in used in a deposition, trial, or other proceeding; and shall not be referred to by any party during the course of the action for any purpose").

### III.    CONCLUSION

We reverse the trial court's order denying Dr. Norberg's motion to dismiss and remand the case to the trial court to decide whether to grant the Ameels a thirty-day extension to cure the deficiency.  *See Leland v. Brandal*, 257 S.W.3d 204, 207 (Tex. 2008).  We affirm the remainder of the trial court's judgment.

JAIME TIJERINA,
Justice

Delivered and filed the
19th day of December, 2019.

14