In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

**NO. 09-20-00266-CV**
_____

**MAGNOLIA PLACE HEALTH CARE, L.L.C., Appellant**

**V.**

**QULIA JACKSON, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF GENE EARL ROBINSON, AND DOMINIQUE SAULS, Appellees**

**On Appeal from the 253rd District Court
Liberty County, Texas
Trial Cause No. CV1914851**

### MEMORANDUM OPINION

This is an interlocutory accelerated appeal from the trial court's order overruling the Defendant's objections to Plaintiffs' expert reports and denying a motion to dismiss Plaintiffs' health care liability claim. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351; *see also id.* § 51.014(a)(9) (providing for interlocutory appeal of an order denying relief under section 74.351). Defendant Magnolia Place Health Care, L.L.C. ("Magnolia," "Defendant," or "Appellant") timely filed this appeal

1

complaining that the trial court erred in overruling their objections and in failing to dismiss the health care liability claim of Plaintiffs Qulia Jackson, Individually and as Personal Representative of the Estate of Gene Earl Robinson, Deceased, and Dominique Sauls (collectively "Plaintiffs" or "Appellees"). We affirm.

## Background

### Allegations in Plaintiffs' Petition

On July 1, 2019, Plaintiffs filed their Original Petition stating a claim for negligence against Magnolia under Chapter 74 of the Texas Civil Practice and Remedies Code. On December 4, 2019, Plaintiffs filed their Fourth Amended Petition, the live pleading at the time the trial court entered the order being appealed, which stated claims for wrongful death under Chapter 74 and survival under Chapter 71.

Plaintiffs alleged that Gene Robinson ("Robinson") had lived at Magnolia for about a year and a half before July 2, 2017, when he was transferred from his dialysis appointment at Dayton Dialysis to Liberty ER due to critically low levels of potassium. Later that same day, Robinson was transferred to Kingwood Medical Center ("Kingwood"), where Robinson was found to have "an unstageable decubitus ulcer measuring 7x8 cm on his backside, cellulitis of left AV fistula, and 2 punctured ulcers on his left AV fistula, which tested positive for Methicillin-Sensitive Staph

2

Aureus" ("MSSA"). The ulcer and infected AV fistula were "managed," and Robinson was discharged back to Magnolia on July 20, 2017.

On July 25, 2017, Robinson was sent to ICON Wound Center ("ICON"), where he was diagnosed with "osteomyelitis (infection of the bone) in the sacral region with stage IV decubitus sacral ulcer." The petition alleged that the ulcer was infected with pseudomonas, Robinson's blood cultures were positive for MSSA, and Robinson had a "stage IV facility acquired pressure ulcer on his buttocks." At ICON, Robinson underwent two debridements of the ulcer on his sacrum. According to the petition, "due to the infection already being spread throughout his body," Robinson died on August 26, 2017, from septic shock.

The Plaintiffs alleged that Magnolia[1] was negligent in its care and treatment of Robinson for:

a. Failing to prevent ulcers,
b. Failing to assess, document and report a change in the Decedent's condition,
c. Failing to institute appropriate nursing interventions to stabilize a patient's condition and/or prevent complications, and
d. Failing to properly train its employees.

The petition alleged that Robinson's death certificate listed sepsis as the cause of death, secondary to end stage renal failure. Plaintiffs claimed Magnolia was grossly

---

[1] Plaintiffs' petition asserted no claims against any other health care provider.

3

negligent for "knowingly and intentionally allow[ing] the deceased to essentially rot in his own bed causing hi[m] to suffer huge, ulcerated bed sores that led to his death."

Dr. Rushing's Report

On or about October 30, 2019, Plaintiffs produced a report and curriculum vitae ("CV") from Lige B. Rushing, M.D. ("Rushing" or "Dr. Rushing"). In the October 2018 report, Dr. Rushing stated that he received his M.D. degree from Baylor University College of Medicine, and interned at Harris Hospital in Fort Worth, Texas. Rushing also has a Master of Science degree in medicine from the University of Minnesota, and he received "specialty training in internal medicine and rheumatology" at the Mayo Clinic in Rochester, Minnesota. According to the October 2018 report and CV, Dr. Rushing is board-certified in internal medicine, rheumatology, and geriatrics, and he continues to actively practice these specialties. Rushing is on the affiliate staff of the Presbyterian Hospital in Dallas, Texas. In the report, Rushing stated that over the course of his medical practice, he had occasion to diagnose and treat patients with conditions similar to or identical with Robinson's, and he was familiar with the standard of care that apply to Magnolia and the health care workers assigned to care for Robinson. Specifically, Rushing stated that he had issued orders for the prevention and treatment of pressure ulcers and supervised the execution of those orders.

4

Rushing's report stated that he had reviewed Robinson's records from Kingwood, ICON, and Robinson's death certificate, but that he anticipated additional records would be forthcoming, and he had specifically requested records from Magnolia. Rushing stated that Robinson had a history of hypertension, dementia with Lewy bodies, end-stage renal disease with dialysis, cellulitis of the arm, and type II diabetes. The report stated that when Robinson was admitted at Kingwood, he was a resident at Magnolia long-term care facility and had been noted to have a decline in status and appetite for about two weeks and a significant decline in mentation. Robinson was taken to the Liberty Emergency Department, where he had been found to have "abdominal distention and an ileus" and very low potassium levels, and he was transferred to Kingwood for further care. Upon admission at Kingwood, it was noted that Robinson had an unstageable deep tissue injury to the buttocks that was "a real problem." Robinson was also treated at Kingwood for hypokalemia and ileus, which improved, but the sacral pressure ulcer did not improve.

Robinson was admitted to ICON on July 27, 2017, and according to Rushing, ICON's records stated the reason for his admission was "a sacral decubitus ulcer, generalized weakness and critical illness myopathy." The ICON records reported that Robinson was diagnosed with advanced dementia, Parkinson's, end-stage renal disease with dialysis three times a week, failure to thrive secondary to decreased PO

intake and secondary to other medical conditions, moderate-to-severe malnutrition, and a necrotic stage IV decubitus ulcer. On August 11, 2017, debridement of the sacral decubitus ulcer was performed, and on August 19, 2017, Robinson had a diverting colostomy. On August 26, he became hypotensive, he was transferred to intensive care, and he developed septic shock, after which his family requested he be placed on comfort care only. Robinson died on August 26, 2017, with the cause of death listed in the hospital record as "septic shock secondary to infected decubitus ulcer, stage IV with necrosis."

According to Rushing's report, the standard of care required Magnolia to: provide necessary care and services to achieve the best practicable well-being pursuant to a comprehensive assessment and plan of care; insure that a resident who enters the facility without pressure ulcers does not develop them unless the resident's condition demonstrates such ulcers were unavoidable; a resident who develops pressure ulcers should receive "the necessary care, treatment, and services" to promote healing, to prevent infection, and to prevent new ulcers; and a facility should not accept nor retain a resident whose needs the facility cannot meet. Further, Rushing stated that Magnolia's conduct fell below the accepted standards of care because (1) Magnolia accepted and retained a resident whose needs it could not meet and (2) Magnolia failed to prevent Robinson's developing a pressure ulcer.

Rushing's report stated that pressure ulcers result from unrelieved pressure on a body part, and such pressure deprives body tissue of necessary oxygen and nutrients. Rushing further stated that in this case, as a result of diminished blood flow, "the tissues died and became necrotic or decayed[,]" which provided a medium for bacteria to invade and multiply. According to Rushing, when this process is unchecked, blood cannot flow to the tissues and organs, sepsis develops, and multiorgan failure and death result. Rushing further stated that when a pressure ulcer develops in the sacral area, fecal material may cause infection or damage the tissues, and to divert fecal material away from the ulcer, a diverting colostomy may become necessary. He also stated that a large, infected pressure ulcer increases the body's caloric requirements by at least 100% to promote wound healing. Rushing's report concluded that the harm or injury that resulted from Robinson's pressure ulcer was:

> …Robinson's malnutrition required a gastric feeding tube, placement and a diverting colostomy, a surgical debridement of his sacral ulcer. If there had been no pressure ulcer there would have been no malnutrition. If there had been no malnutrition then there would have been no necessity for a gastric feeding tube. If there had been no pressure ulcer then there would have been no necessity for a diverting colostomy, a major surgical procedure that could have been avoided.

Nurse Gardner's Report

On or about July 31, 2019, Plaintiffs also produced the report and CV of Ventura Gardner, a registered nurse. Gardner stated she had clinical experience in critical care, Emergency Department, peri-operative nursing, medical/surgical,

7

endoscopy nursing, ambulatory care, and wound care nursing. She also stated she had served as a hospital supervisor and Lead for The Joint Commission Certification for specialty diseases (Orthopedics). Gardner's report stated that she had reviewed Robinson's medical records from Kingwood and ICON but that at the time of her report, records from Magnolia or Liberty ER were not available. Gardner's report included a similar medical overview as Rushing's, and Gardner added that upon admission at Kingwood, Robinson's decubitus ulcer was extensive enough as to leave his tailbone exposed. Gardner's report also stated that Robinson "was non-verbal, unable to advocate for himself, and unable to understand simple directions or questions."

According to Gardner, the standard of care required the nursing staff to provide a safe environment and to protect the patient from avoidable injury and to assess, document and timely report a change in the patient's condition to the physician. Gardner stated that "[t]he nurses from facilities prior to [Robinson's admission to] Kingwood" breached the standard of care by (1) failure to implement interventions to prevent ulcer development, such as frequent turning, padding bony areas, using a specialty bed, and closely monitoring his nutritional status; and (2) failure to report a change in Robinson's condition to a physician. According to Gardner, the fact that Robinson's tailbone was exposed indicated that the nursing staff failed to meet basic standards of care. Gardner stated that "there is no indication

8

nursing from [facilities that treated Robinson prior to Kingwood] notified the physician in a timely manner to intervene when the ulcers began to develop and continued to worse[n.]" Gardner's report stated that standard nursing interventions to reduce the development of decubitus ulcers include:

> …turning him every 2 hours, providing a specialty bed which off loads pressure points of bedridden patients, hourly rounds to assist with toileting (assess for urine/stool and clean him as needed to prevent further decubitus ulcer development), and clear plan of care, especially related to changes in condition of ulcers, between nursing and physician.

According to Gardner, as a result of deficient nursing care, the pressure ulcer developed, the tailbone became exposed, Robinson became septic and required additional procedures, and subsequently died.

Magnolia's Objections to the Reports and Motion to Dismiss

Magnolia filed objections to Rushing's and Gardner's reports. Magnolia then filed a Motion to Dismiss Plaintiffs' Suit Pursuant to C.P.R.C. § 74.351 & Response to Plaintiffs' Motion to Deem Sufficiency ("Motion to Dismiss"). Magnolia argued that Rushing was not qualified to render an opinion on standard of care or liability in this case and his report was "non-specific speculation and conclusory" because Rushing failed to identify specific actions or omissions by Magnolia and was insufficient to show causation. As to Gardner's report, Magnolia argued that she was not qualified to render an expert opinion in this case, her report was speculative, and the standard of care she offered was "non-specific speculation and [] conclusory."

According to Magnolia, Gardner failed to identify specific actions or omissions by Magnolia and lacked specificity regarding what conduct was expected. Magnolia also argued that Gardner's report was conclusory and insufficient as to causation. Magnolia also acknowledged that the Plaintiffs had requested the statutory option of a thirty-day extension of time to correct deficiencies if the trial court found deficiencies that were curable.

Plaintiffs' Response to Magnolia's Objections

In their response, the Plaintiffs argued that both Rushing's and Gardner's reports provided "at a minimum, a good faith effort to comply" with the requirements of Chapter 74, both reports set forth a fair summary of the relevant standard of care and breach thereof, and that Rushing's report established a causal link between Magnolia's breach and Robinson's death. The Plaintiffs denied that the reports were conclusory because both reports "clearly state the cause of [Robinson's] death as supported by the death certificate and the standard of care that was breached."

The Plaintiffs argued that Rushing was qualified to render an opinion in this case based on his expertise and experience in internal medicine, geriatrics, and rheumatology. The Plaintiffs denied that Rushing's report was conclusory or speculative. According to the Plaintiffs, Rushing's report was clear that Magnolia breached the applicable standard of care by (1) accepting and retaining a resident

10

whose needs Magnolia could not meet and (2) failing to prevent Robinson from developing a pressure ulcer. The Plaintiffs also argued that Magnolia knew or should have known that Robinson was at high risk of developing pressure ulcers.

The Plaintiffs also argued that Gardner was qualified to render an opinion in this case based on her thirty-nine years as a registered nurse and her experience in critical care and nursing leadership and supervision. The Plaintiffs argued that Gardner had specifically stated that Magnolia breached the applicable standard of care by failing to notify a physician of a change in Robinson's status—specifically his development of a stage IV decubitus ulcer—and failing to institute appropriate nursing interventions to prevent the development of decubitus ulcers, to stabilize Robinson's condition, and to prevent complications. The Plaintiffs' response also noted that Gardner had identified specific nursing practices that should have been implemented, including assistance with toileting, providing a specialty bed, and repositioning and cleaning the patient every two hours or as needed.

Trial Court's Order

The trial court found the expert reports were deficient as set out in Magnolia's objections. The court further found that the deficiencies were curable and granted a thirty-day extension to cure defects, as provided by section 74.351.

Dr. Rushing's Amended Report

Dr. Rushing provided an amended report dated January 9, 2020. The amended report was substantially the same as his original report, with a few additions. As to his qualifications, Rushing added that he had many years of direct care for nursing home residents and "[b]eginning in 1959 I had the primary responsibility for nursing home patients and I have continued to have nursing home patients during 2019." Rushing also stated that he had testified as a medical expert numerous times concerning nursing home and bedsore or pressure ulcer cases. Dr. Rushing also added the following to his report:

> Magnolia Place [] thus far has refused to produce the clinical records for Gene Earl Robinson. I have been forced to produce a chapter 74 report without this vital record. I reserve the right to amend my initial chapter 74 report and the first amended report when and if the defendant[] produce[s] the Magnolia Place health records. As a result I have had to rely on the records available to me at the time of preparation of this report. When he arrived at the Liberty Emergency Department he was found [to] have a deep tissue injury/pressure ulcer on hi[s] buttocks measuring 7x8 cm, unstageable. I am concluding that Mr. Robinson did in fact have this injury when he left Magnolia Place. My opinion is that he more likely than not developed the pressure ulcer/deep tissue injury while he was a resident at Magnolia Place. If records are provided to me that demonstrate that he was admitted to Magnolia Place with the pressure ulcer then obviously my opinion would change.

Nurse Gardner's Amended Report

Nurse Gardner provided an amended report dated January 9, 2020. In her amended report, Gardner stated that her nursing duties included acute and chronic

12

wound management as well as bathing, feeding, turning, and repositioning patients. She also reported that she had been responsible for cleaning wounds according to a physician's order and notifying a charge nurse of changes in patients' condition. As to the applicable standard of care, Gardner added the following: "Institute appropriate nursing interventions that might be required to stabilize a client's condition and/or prevent complications[.]"

In addressing deviation from the standard of care, Gardner added the following in her amended report:

> [] The nurses from facilities prior to Kingwood Medical Center did not provide the appropriate basic nursing interventions to help prevent the pressure ulcers and did not seek further treatments of his pressure ulcers in a timely fashion. If they had taken the proper precautions discussed to prevent the pressure ulcer and advocate to the physician on behalf of the patient to refer the patient to a wound specialist sooner, the pressure ulcer would not have been as extensive as described. The nurses at the facility failed to do this.…Mr. Robinson was nonverbal. He could not speak for himself to even tell anyone he was in pain or uncomfortable and this type of wound is very painful. The nurses did not seek additional treatment and care for this patient who could not speak for himself. Again, if this had been done he would have received appropriate wound care treatments much sooner than he had.
> . . . .
> …The nurses also did not advocate on behalf of the patient to receive the specialized care that he desperately needed to help treat his wounds. According to the records, Mr. Robinson did not go to a wound care specialist until after he was admitted to Kingwood Medical Center on 7/2/17 and his bone was exposed. As nurses, our basic fundamental of nursing is to care for our patients. Not just "provide" care such as bathing and giving medications but to actually "care" about their well-being and to take the extra steps that are needed sometimes to champion on their behalf or advocate for them. The wounds that Mr. Robinson had did not develop overnight, it took hours, days, and weeks to develop

13

a pressure ulcer of that magnitude and the nurses failed to properly assess the extent of Mr. Robinson's injuries and advocate for his proper care.

Gardner also added narrative about the nature of pressure ulcers, prevention of pressure ulcers, and a facility's responsibility for the residents' quality of life.

Magnolia's Objections to the Amended Reports

Magnolia filed Objections to Plaintiffs' Amended Expert Reports & Supplemental Motion to Dismiss with Attorney[']s Fees Pursuant to C.P.R.C. § 74.351. Therein, Magnolia argued that

> …Plaintiffs' Reports fail to satisfy the statutory requirements and admit to never having received or reviewed Gene Robinson's medical records from Magnolia Place, thus having no knowledge of events, Robinson's condition or Defendant's conduct they can not meet statutory requirements as a matter of law. [] *See Transitional Care Ctrs[.] of Tex. Inc., v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001).

Magnolia argued that the reports did not have a reliable basis as to any element of Plaintiffs' claims and, therefore, they cannot be a good faith effort to comply with the requirements of Chapter 74. According to Magnolia, because Rushing and Gardner only reviewed records from Kingwood and ICON, their reports rely on reports by persons without personal knowledge of Magnolia or what occurred at Magnolia, and as a consequence, the reports constitute "speculation and unfounded conclusions" regarding any liability by Magnolia for Robinson's injuries and death.

Magnolia's motion alleges that it had advised Plaintiffs from February 28, 2018 to April 29, 2019, that an authorization signed by a legally authorized

14

representative of Robinson's estate was required to obtain Robinson's medical records from Magnolia. Only after the trial court found the first reports deficient and granted a thirty-day extension of time did the Plaintiffs produce an authorization for medical records signed by a court-appointed administrator of Robinson's estate. Magnolia further alleged that it produced three volumes of Magnolia's medical records for Robinson on January 10, 2020, and three days later, Plaintiffs produced Rushing's and Gardner's amended reports.

As to Nurse Gardner, Magnolia argued that her experience was in acute hospital care, and her CV identified no training, experience, or education in the same field as Magnolia—nursing home care. According to Magnolia, lacking such experience or training, Gardner "is no more than a lay witness[.]" As to the standard of care Gardner outlined, Magnolia argued that Gardner did little more than cite to government statutes and regulations that are "mere global comments and principles," and insufficient to specify Magnolia's duty of care. In addition, Magnolia argued that Gardner's report did not satisfy statutory requirements because it failed to specifically identify what Magnolia should have done, what it did not do, and what it should have done differently. In particular, Magnolia stated that Gardner's report referred vaguely to "facilities prior to Kingwood[]" and cited no specific conduct by Magnolia. Magnolia further argued that the standard of care offered by Gardner are only general concepts regarding assessment, monitoring, and interventions that are

insufficient as a matter of law. In addition, Magnolia argued that as a nurse, Gardner is not qualified to render an opinion on causation as a matter of law, citing to section 74.351(r)(5)(C) of the Texas Civil Practice and Remedies Code.

As to Dr. Rushing, Magnolia argued that Rushing was not qualified because Rushing's report and CV demonstrate no experience in the field of nursing home care and Rushing reported his experience was as a physician in private practice at hospitals. According to Magnolia, the standards of care Rushing provided pertain to administrative functions of a nursing home and not the conduct of RNs, LVNs, or CNAs. Magnolia also argued that Rushing offered only "vague general principles" taken from the Code of Federal Regulation and the Texas Administrative Code that only address administrative responsibilities and do not define the duties or responsibilities of RNs, LVNs, or CNAs. Magnolia further argued that Rushing failed to describe any breach of administrative duties by Magnolia that resulted in Robinson's injuries or death. According to Magnolia, Rushing's report is speculative, misleading, and conclusory and fails to explain specifically how and why Magnolia's alleged negligence caused Robinson's injuries and ultimate death, and any connection between Magnolia's conduct and Robinson's injuries and death is too attenuated to articulate a causal relationship. Therefore, Magnolia argued the expert reports did not satisfy the requirements of section 74.351 and the case should be dismissed with prejudice.

Plaintiffs' Response to Magnolia's Second Motion to Dismiss

In their response to Magnolia's motion, the Plaintiffs acknowledged that Linda Robinson was appointed as the administrator of Robinson's estate on November 26, 2019, Plaintiffs paid for Magnolia's records on December 17, 2019, and Plaintiffs received the medical records from Magnolia on January 13, 2020. According to the Plaintiffs, "Magnolia Place has continually been obstructive" trying to get the case dismissed. Plaintiffs argued that because Magnolia had not argued in its first motion to dismiss that Dr. Rushing's and Nurse Gardner's initial reports did not mention Magnolia's medical records for Robinson, it could not make this argument in its second motion to dismiss, citing to *Bakhtari v. Estate of Dumas*, 317 S.W.3d 486 (Tex. App.—Dallas 2010, no pet.). Plaintiffs further argued that Magnolia had "unclean hands in attempting to use its refusal to produce records for [] Robinson as a sword in claiming that the amended reports are not adequate under Chapter 74[]" and it should not profit "from these unfair tactics."

Plaintiffs also argued that Chapter 74 does not require the expert to review any particular records, that Dr. Rushing based his opinion on Robinson's condition upon arrival at the Liberty ER and at Kingwood where Robinson had a severe, unstageable pressure ulcer on his buttocks, and that according to Dr. Rushing, it was more likely than not that the pressure ulcer developed at Magnolia due to negligent care. According to the Plaintiffs, the amended reports identify the relevant standard

17

of care, how Magnolia breached the standard of care, and the causal link between Magnolia's breach and Robinson's untimely death. Plaintiffs maintained that both Nurse Garner and Dr. Rushing were qualified to render an opinion in this case based on their experience and training. Plaintiffs further argued that Dr. Rushing's opinion on causation was not speculative or conclusory: Rushing stated that Robinson died of sepsis from bed sores that Robinson developed as a resident at Magnolia, that Magnolia knew or should have known Robinson was at high risk of development bed sores, and that Rushing could make inferences about Robinson's care at Magnolia based on "circumstantial evidence in the records" and inferences from other medical records. Plaintiffs argue that the amended reports satisfy Chapter 74's requirements because they inform Magnolia of the specific conduct called into question and provide a basis for the trial court to conclude that the Plaintiffs' claims have merit.

Magnolia's Reply to Plaintiffs' Response

In its Reply to the Plaintiffs, Magnolia argued it did not have "unclean hands," and that any delay in the production of Magnolia's medical records for Robinson was due to Plaintiffs' failure to produce an authorization signed by a legally authorized representative of Robinson's estate. According to Magnolia, Plaintiffs only obtained a valid authorization on December 2, 2019, and then delayed another sixteen days before producing the authorization to Magnolia. In addition, Magnolia

argued that its statement that Dr. Rushing and Nurse Gardner had not reviewed the medical records from Magnolia "is not an objection, it is a fact[,]" and therefore Plaintiffs' waiver argument was misplaced. Magnolia argued that Rushing's and Gardner's reports improperly opine from assumptions that were not linked to the facts, and as such, were speculative and conclusory. Magnolia argued that Robinson had pressure sores at the time he was admitted.

After a hearing, on November 12, 2020, the trial court signed an order denying Defendant's Objections to Plaintiffs' Amended Expert Reports and Defendant's Supplemental Motion to Dismiss, and Magnolia filed its notice of interlocutory appeal.

## Issue

In a single issue on appeal, Magnolia argues that the trial court abused its discretion in denying its motion to dismiss because the expert reports were deficient regarding the applicable standard of care, Magnolia's breach of the standard of care, and proximate cause. Magnolia also argues that Nurse Gardner is not qualified to opine regarding causation and not qualified to testify against a nursing home.

## Standard of Review

In health care liability cases, we review a trial court's ruling on a motion to dismiss based on the adequacy of an expert report for an abuse of discretion. *See Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (per curiam);

19

*Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015) (per curiam); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877-78 (Tex. 2001). "A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam). A trial court's ruling does not constitute an abuse of discretion simply because the appellate court would have ruled differently under the circumstances. *See id.* A trial court also abuses its discretion if it fails to analyze or apply the law correctly. *See In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex. 2004) (citing *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992)).

In reviewing a report's sufficiency under this standard, "we consider only the information contained within the four corners of the report." *Abshire*, 563 S.W.3d at 223 (citing *Palacios*, 46 S.W.3d at 878). In determining whether the report contains the requisite information, we view the entirety of the report rather than isolating specific portions or sections. *See Baty v. Futrell*, 543 S.W.3d 689, 694 (Tex. 2018); *Van Ness*, 461 S.W.3d at 144. One expert need not address the standard of care, breach, and causation, and multiple expert reports may be read together to determine whether these requirements have been met. *Abshire*, 563 S.W.3d at 223 (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.351(i)).

While the report "need not marshal all the plaintiff's proof," it must provide a fair summary of the expert's opinions as to the applicable standards of care, how the care rendered by the health care provider failed to meet the standards, and the causal relationship between that failure and the injury claimed. *Jelinek v. Casas*, 328 S.W.3d 526, 543 (Tex. 2010); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6); *Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006); *Palacios*, 46 S.W.3d at 875, 878. In determining the adequacy of an expert report, a court reviews the pleadings to determine the claims alleged and whether the report addresses those claims. *See Christus Health Se. Tex. v. Broussard*, 306 S.W.3d 934, 938 (Tex. App.—Beaumont 2010, no pet.) (citing *Windsor v. Maxwell*, 121 S.W.3d 42, 51 (Tex. App.—Fort Worth 2003, pet. denied)). The report must "explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented." *Jelinek*, 328 S.W.3d at 539-40.

Expert Report Requirements Under Chapter 74

Chapter 74 of the Civil Practice and Remedies Code, also known as the Texas Medical Liability Act ("the Act"), requires health care liability claimants to serve an expert report upon each defendant not later than 120 days after that defendant's answer is filed. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). The purpose of the expert report requirement is to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims. *Abshire*, 563

21

S.W.3d at 223 (citing *Palacios*, 46 S.W.3d at 877); *see also Loaisiga v. Cerda*, 379 S.W.3d 248, 258 (Tex. 2012) ("[Expert report] requirements are meant to identify frivolous claims and reduce the expense and time to dispose of any that are filed."). In accordance with that purpose, the Act provides a mechanism for dismissal of the claimant's suit in the event of an untimely or deficient report. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b).

An expert report is sufficient under the Act if it "provides a fair summary of the expert's opinions…regarding applicable standards of care, the manner in which the care rendered…failed to meet the standards, and the causal relationship between that failure and the injury[.]" *Id.* § 74.351(r)(6). The trial court need only find that the report constitutes a "good faith effort" to comply with the statutory requirements. *Id.* § 74.351(l); *see also Abshire*, 563 S.W.3d at 223; *Palacios*, 46 S.W.3d at 878. The Texas Supreme Court has held that an expert report demonstrates a "good faith effort" when it "(1) inform[s] the defendant of the specific conduct called into question and (2) provid[es] a basis for the trial court to conclude the claims have merit." *Baty*, 543 S.W.3d at 693-94. A report "need not marshal all the claimant's proof," but "a report that merely states the expert's conclusions about the standard of care, breach, and causation" is insufficient. *Abshire*, 563 S.W.3d at 223; *Palacios*, 46 S.W.3d at 878-79.

Expert Qualifications

According to Appellant, to the extent Nurse Gardner's report opines on medical causation, her report is deficient because as a matter of law, a nurse is not qualified to give opinion testimony on medical causation. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(C). Appellee concedes that Gardner is not qualified to render opinions on causation, so we do not address the point further. *See* Tex. R. App. P. 47.1.

Appellant also argues that Gardner is not qualified to render an opinion in this case because her CV identifies no training, education, or experience in the same field as Magnolia—that is, in nursing home care. According to Appellant, Gardner's experience is as a nurse working in acute care hospitals, not in a nursing home.

To be qualified to opine that an institutional health-care provider breached the applicable standard of care, a person must have "'knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim'" and be "'qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.'" *Mem'l Hermann Health Sys. v. Heinzen*, 584 S.W.3d 902, 911 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (quoting Tex. Civ. Prac. & Rem. Code Ann. § 74.402(b)(2), (b)(3)). For certain medical-negligence claims against non-physicians, a person is qualified to render an expert report only if the person had

23

been engaged in a field of health care involving the same care or treatment as the defendant—but only if the defendant health care provider is an *individual*. *Id.* (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.402(b)(1)). Because Magnolia is not an individual, this provision does not apply to a report regarding the care Magnolia provided through its nursing staff. *See id.* at 911-12 (citing *Harvey v. Kindred Healthcare Operating, Inc.*, 578 S.W.3d 638, 644-46 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (determining subsection inapplicable to an expert report addressing a claim against a hospital for its nursing staff's conduct)). A person may be qualified to render an expert opinion regarding the applicable standard of care for hospital nursing staff based on previously acquired experience. *See, e.g.*, *id.* at 912; *see also Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 461 n.37 (Tex. 2017). "Section 74.351(r)(5)(B) does not require an expert to have the same specialty as the health care provider she evaluates." *Zamarripa*, 526 S.W.3d at 461 n.37 (citations omitted).

In this case, Nurse Gardner reported that her thirty years of nursing experience included work as a wound management nurse, including cleaning wounds according to a physician's order, cleaning and dressing wounds, repositioning patients every two hours, and reporting to the charge nurse of any changes in the patient's status. She also reported experience with both chronic and acute wounds. Therefore, the trial court did not err in concluding that Gardner's training and experience was

24

adequate to render a report on the applicable standard of care and breach based on the Plaintiffs' claims in this case. *See Zamarripa*, 526 S.W.3d at 461 n.37; *Heinzen*, 584 S.W.3d at 911-12.

Standard of Care and Breach

The standard of care is defined by what an ordinarily prudent healthcare provider would have done under the same or similar circumstances. *See Palacios*, 46 S.W.3d at 880. "Identifying the standard of care is critical: Whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently." *See id.* While Chapter 74 requires only a "fair summary" of the standard of care and how it was breached, "even a fair summary must set out what care was expected, but not given." *Id.* (quotation omitted).

Appellant argues that Nurse Gardner did not identify Magnolia specifically, nor did she identify the standard of care applicable to Magnolia nor any conduct or breach by Magnolia. According to Appellant, Gardner "vaguely and collectively referred to 'nurses' at 'facilities prior to Kingwood Medical Center.'" Appellant also argues that Gardner did not review the medical records from Magnolia, Dayton Dialysis, or Liberty Medical Center ER, and that her report did not differentiate between these providers. According to Appellant, the standards of care Gardner identified were "no more than general assertions and statements that a patient should

25

be kept safe." Appellant also argues that Gardner did not identify any interventions to prevent ulcer development that Magnolia failed to implement or how and when Magnolia failed to assess Robinson's skin.

As to Dr. Rushing, Appellant argues that the standard of care provided in Rushing's report was impermissible global or general assertions and statements regarding safety without explaining what constituted necessary care and services or discussing the standards for accepting or retaining residents. According to Appellant, Rushing's report failed to tie his opinion to any facts regarding care by Magnolia and failed to discuss the alleged breaches of care with specificity. Appellant argues that Rushing did not explain how Magnolia failed to prevent Robinson from developing a pressure ulcer nor did he tie Robinson's ulcer to any negligent acts or omissions by Magnolia.

We read Gardner's and Rushing's report together to determine whether the statutory requirements have been met. *See Abshire*, 563 S.W.3d at 223 (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.351(i)). Nurse Gardner's amended report stated that the applicable standard of care required Magnolia: to provide a safe environment; protect the patient from avoidable injury; to provide care in a safe setting; to assess, document, and timely report a change in a patient's condition to a physician; and to institute appropriate nursing interventions to stabilize a patient's condition and prevent complications. Gardner stated that appropriate interventions

26

for the prevention of bed sores include daily assessment of skin and pressure points, turning the patient every two hours, padding bony prominences, using a specialty bed, closely monitoring the patient's nutritional status, and using skin cleansers and moisturizers. Dr. Rushing's amended report stated that the applicable standard of care required Magnolia to provide necessary care and services to maintain the highest practicable patient well-being; to insure that a patient who enters the facility without pressure sores does not develop them unless unavoidable; to provide care, treatment, and services to a patient with pressure sores to promote healing, prevent infection, and prevent new ulcers from forming; and not to accept or retain a resident whose needs the facility cannot meet. Rushing also stated that Robinson's clinical condition did not demonstrate that his pressure ulcers were unavoidable.

As to breach, Gardner's amended report stated that nurses at facilities where Robinson was treated prior to his admission to Kingwood failed to appropriately assess Robinson for pressure ulcers, failed to implement interventions to prevent ulcer development, and failed to timely report a change in Robinson's condition to a physician. Gardner's report also stated that the nurses failed to adequately advocate for Robinson, who was nonverbal and could not report pain or discomfort. According to Gardner, Robinson was not transferred to an emergency room because his pressure ulcer was severe, but rather he went to his regular dialysis appointment on July 2, 2017, where he was transferred to an emergency room due to critically

27

low potassium and then to Kingwood, where the pressure ulcer was extensive, and his tailbone was found to be exposed. Gardner wrote:

> …This type of ulcer does not develop overnight. Stage IV decubitus ulcers develop when nursing fails to meet basic standards of care. The ulcer with exposure of bone is evidence of extended periods without being turned, poor padding of bony prominence, and nursing failure to provide safe environment, failure to perform appropriate physical assessments and report changes in condition to a physician, failure to provide adequate nutrition to prevent ulcer, and overall gross neglect of Mr. Robinson at facilities prior to his admission to Kingwood[.]

Dr. Rushing's amended report stated that Magnolia knew or should have known that Robinson was at high risk for the development of pressure ulcers because his mobility was greatly limited, and he was generally confined to bed. According to Rushing, Magnolia accepted and maintained a resident whose needs it could not meet and it failed to prevent Robinson from developing a pressure ulcer.

We conclude that Dr. Rushing's and Nurse Gardner's amended reports read together adequately identify "what care was expected, but not given." *See Palacios*, 46 S.W.3d at 880. Both Rushing and Gardner stated that Magnolia failed to prevent Robinson from developing a pressure ulcer. Gardner's report provides several specific examples of nursing interventions for the assessment, care, and prevention of pressure sores. Therefore, we conclude that the trial court did not err in concluding that the amended reports met the Act's requirement for identifying the applicable standard of care and how Magnolia failed to meet the standards, and they were

sufficient to put Magnolia on notice of the conduct complained of. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6); *Palacios*, 46 S.W.3d at 880.

Causation

The Act also requires an expert report to address causation—"how and why" the alleged negligence caused the injury in question. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6); *Abshire*, 563 S.W.3d at 224 (quoting *Jelinek*, 328 S.W.3d at 536). A conclusory statement of causation is inadequate, and the expert must explain the basis of his statements and link conclusions to specific facts. *Abshire*, 563 S.W.3d at 224; *Jelinek*, 328 S.W.3d at 539; *see also Zamarripa*, 526 S.W.3d at 461 ("[W]ithout factual explanations, the reports are nothing more than the ipse dixit of the experts, which…are clearly insufficient."). In satisfying this "how and why" requirement, the expert need not prove the entire case or account for every known fact, and the report is sufficient if it makes "'a good-faith effort to explain, factually, how proximate cause is going to be proven.'" *Abshire*, 563 S.W.3d at 224 (quoting *Zamarripa*, 526 S.W.3d at 460).

According to the Appellant, Rushing's report was deficient regarding proximate cause because he did not opine that an alleged breach of care by Magnolia proximately caused Robinson's death nor that a pressure ulcer was a proximate cause of death. Appellant argues that Rushing's report is "no more than a series of conclusory statements[]" and failed to identify any conduct by Magnolia that caused

29

injury or death. Appellant further argues that Rushing's opinion is based upon "assumptions surmised" only from the records of Kingwood and ICON and that such assumptions are mere conjecture and speculation because they fail to link conclusions to specific conduct by Magnolia. Appellant also argues that the failure to have medical records from Magnolia does not excuse a deficient expert report.

Dr. Rushing's amended report stated that the cause of death listed in the records of Kingwood Medical Center was "septic shock secondary to infected decubitus ulcer, stage IV with necrosis." Rushing's amended report also stated that upon admission to Kingwood, a physical examination of Robinson showed "a deep tissue injury to the buttocks measuring 7x8 cm, unstageable." Rushing further stated that unrelieved pressure on blood vessels shut off blood flow to tissues, "the tissues died and became necrotic or decayed[]" and "[t]he decayed tissue is an ideal culture medium for bacteria." Rushing also stated that, if unchecked, the spread of infection results in sepsis and multiorgan failure and death. According to Rushing, because Robinson arrived at the Liberty ER with a 7x8 cm pressure ulcer, he concluded that Robinson had this injury when he left Magnolia and "he more likely than not developed the pressure ulcer/deep tissue injury while he was a resident at Magnolia[.]"

We initially note that, according to Appellant, in *Estate of Regis v. Harris County Hospital District*, 208 S.W.3d 64 (Tex. App.—Houston [14th Dist.] 2006,

30

no pet.), the Houston Fourteenth Court held that the trial court did not err by dismissing plaintiff's claims where the plaintiff did not provide a valid authorization for the release of medical records and plaintiff failed to timely serve an adequate expert report. We find *Regis* factually distinguishable. In *Regis*, the court explained that a plaintiff's failure to provide proper authorization for the release of medical information abates the proceedings until sixty days following receipt of the required authorization, but the sixty-day abatement period does not toll the 120-day period for filing an expert report. *Id.* at 69. In the case at bar, Plaintiffs' expert reports were timely filed, and *Regis* does not apply.

We conclude that Dr. Rushing's explanation provides a sufficient preliminary link between the nurses' alleged breach of the standard of care at Magnolia and Robinson's development of a severe pressure ulcer and sepsis. *See Abshire*, 563 S.W.3d at 225. That is, the report draws a line directly from the nurses' failure to properly provide care to prevent and treat pressure ulcers to Robinson's development of complications (malnutrition and the need for a diverting colostomy) and to the ultimate injury (sepsis, multiorgan failure, and death). *Id*. Dr. Rushing's report then also ties his conclusion to the underlying facts—the failure to implement preventive measures, to assess and treat pressure sores, and to timely report patient changes to a physician. *See id.* at 225-26. Because at this stage of the proceeding we are not supposed to require a claimant to "present evidence in the report as if it were actually

litigating the merits[,]" we simply cannot say that the trial court abused its discretion in reaching the conclusion that Dr. Rushing's amended report constitutes a good faith effort to comply with the Act's requirement to provide a fair summary of his opinion with respect to the causal relationship between Magnolia's alleged breach and Robinson's death, and we cannot say that the amended report failed to inform the Defendant of the specific conduct called into question or that it fails to provide a basis for the trial court to conclude the claims have merit. *See Abshire*, 563 S.W.3d at 226 (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.351(l), (r)(6); *Palacios*, 46 S.W.3d at 879); *Baty*, 543 S.W.3d at 693-94. Accordingly, we must overrule Appellant's issue, and we affirm the trial court's order.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on June 23, 2021
Opinion Delivered December 30, 2021

Before Golemon, C.J., Kreger and Johnson, JJ.

32